## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| HOMELAND INSURANCE COMPANY OF NEW YORK,<br><br>              Plaintiff,<br><br>vs.<br><br>HEALTH CARE SERVICE CORPORATION, *D/B/A* BLUE CROSS BLUE SHIELD OF ILLINOIS, BLUE CROSS BLUE SHIELD OF NEW MEXICO, BLUE CROSS BLUE SHIELD OF OKLAHOMA, AND BLUE CROSS BLUE SHIELD OF TEXAS,<br><br>              Defendant. | CIVIL ACTION NO. 18-cv-6306<br><br>**JURY DEMAND**<br><br>RELATED CASE<br>1:17-CV-02480<br><br>Hon. Gary Feinerman |

## HOMELAND INSURANCE COMPANY OF NEW YORK'S
## COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY JUDGMENT

Plaintiff Homeland Insurance Company of New York ("Homeland") brings this complaint for breach of contract and declaratory relief (the "Complaint") against Defendant Health Care Service Corporation d/b/a Blue Cross Blue Shield of Illinois, Blue Cross Blue Shield of New Mexico, Blue Cross Blue Shield of Oklahoma, and Blue Cross Blue Shield of Texas (collectively, "HCSC"). Homeland accordingly alleges and seeks relief as follows:

## GENERAL ALLEGATIONS

1.      Homeland is a corporation organized and existing under the laws of New York, with its principal place of business in Plymouth, Minnesota. Homeland is permitted to issue insurance policies in the State of Illinois.

2.      Homeland provided excess Managed Care Organization Errors and Omissions ("E&O") liability insurance to HCSC (the "Homeland Policy"). HCSC has been sued in several class actions across the nation alleging violations of antitrust laws. These antitrust class actions lawsuits were later consolidated for pretrial proceedings in the Northern District of Alabama (collectively with the component class actions, the "MDL Action"). HCSC sought coverage for the MDL Action from its insurers.

3.      A coverage dispute arose and primary insurer Allied World Surplus Lines Insurance Company f/k/a Darwin Select Insurance Company ("Allied World"), filed a declaratory relief action in the Northern District of Illinois against HCSC.[1] The pending Allied World action is a related action (the "Related Case") in that it involves the same facts and law as the instant Complaint. Allied World provided primary E&O coverage with a $20 million limit of liability for claims relating to antitrust activity (the "Allied World Primary Policy"). Allied World's complaint seeks a judicial determination of "no coverage" under its Primary Policy. A copy of the Allied World complaint in the Related Case is attached hereto as **Exhibit A.** Homeland's Policy is excess and generally "follows form" to Allied World's Primary Policy.

---

[1] *Allied World v. HCSC,* Case No. 1:17-cv-02480, filed March 31, 2017 and assigned to the Honorable Gary Feinerman.

Homeland therefore similarly seeks a judicial declaration that there is no coverage under the Allied World Primary Policy, and by extension, Homeland's Policy.

4.     Homeland has been investigating coverage for the antitrust class actions since their inception in 2012 and for the MDL Action following the MDL Transfer Order in December of 2012.  As the parties to the MDL Action explore informal resolution, Homeland has been and will continue to be asked to evaluate coverage for any potential settlement or judgment. Throughout its investigation, Homeland has requested clearly relevant information necessary for it to (1) assess HCSC's potential liability in the class action lawsuits consolidated in the MDL Action and to (2) make determinations regarding coverage.

5.     Rather than comply with Homeland's requests, HCSC has, through its coverage counsel and defense counsel in the Related Case, refused to provide the majority of the requested information and has taken the position that Homeland's requests are covered by the mediation privilege, or that Homeland is simply not entitled to them.  As to many of the documents, HCSC's coverage counsel claims disclosure is barred by the attorney-client and or work product privileges.  Worse, HCSC claims it is in the process of settling the Related Case with Allied World and other insurers, and is refusing to provide Homeland with any information or documents relating to that settlement.  Any settlement agreement with underlying insurers will surely impact whether, when and/or to what extent Homeland will be asked to pay under its policy.  As a result, Homeland has been forced to file this action to, among other things, seek the Court's declaration of the scope and meaning of the cooperation clause and to enforce Homeland's rights under it.  Homeland also seeks a judicial determination that HCSC breached the Homeland Policy by repeatedly failing to provide the requested information and documents, and that this breach precludes coverage.  Alternatively, Homeland seeks specific performance under its policy in the form of an order requiring HCSC to provide all of the requested information.

6.     The MDL Action seeks relief that may or may not be covered under the Homeland Policy, and involves both insured and non-insured entities.  Homeland thus also seeks

a judicial determination that it has no obligation to pay under its excess policy unless and until HCSC establishes that payments made by it or any other underlying insurer(s) were for covered loss and for covered entities in amounts that completely exhaust the retention and all underlying limits.  Whether the MDL Action ends by judicial determination or settlement, exhaustion of the underlying policy limits by payments made for covered loss is a condition precedent and must be established before coverage under Homeland's Policy can be triggered.  Without a judicial determination on this issue, Homeland will have to choose between prematurely reimbursing defense expenses and/or paying indemnity (which could impact its right to seek reimbursement and subrogation), and denying coverage (which could potentially expose it to bad faith allegations).  This dilemma underscores Homeland's need for the cooperation of HCSC in providing the requested information.

## The Parties

7.      Homeland is a corporation organized and existing under the laws of New York, with its principal place of business in Plymouth, Minnesota.  Homeland is permitted to issue insurance policies in the State of Illinois.

8.      Upon information and belief, Defendant HCSC is a corporation organized and existing under the laws of the State of Illinois with its principal place of business in the State of Illinois.

## Jurisdiction and Venue

9.      This is a diversity action for breach of contract and declaratory relief pursuant to 28 U.S.C. § 2201 to declare the rights and other legal relations of the parties regarding insurance policies.

10.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a).  There is complete diversity of citizenship between Homeland and HCSC.  The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

11.      This Court has personal jurisdiction over HCSC, and venue is proper in this District under 28 U.S.C. § 1391.

-4-

**Nature of the Action**

12.     This action is brought pursuant to 28 U.S.C. § 2201, which provides that the Court may declare the rights and other legal relations of the parties.  An actual controversy of a judicial nature exists between Homeland and HCSC involving the parties' rights and liabilities under the Homeland Policy which provides E&O liability insurance to HCSC and follows form to Allied World's Primary Policy.  The construction of the Homeland Policy and the controversy existing between Homeland and HCSC may be determined by a judgment of this Court.

13.     This action also seeks specific performance to remedy HCSC's breach of the Claim Participation and Assistance and Cooperation clauses in the Homeland Policy and Allied World Primary Policy, respectively.

**BACKGROUND ALLEGATIONS**

**The MDL Action**

14.     In 2012, a number of class action complaint were filed against multiple Blue Cross Blue Shield entities or member plans ("BCBS" or the "Blues") and the Blue Cross Blue Shield Association ("BCBSA" or the "Association") alleging violations of antitrust laws.  The lawsuits allege generally that the Blues and the Association conspired to leverage their economic power and market dominance to under-compensate healthcare providers for their services and to increase healthcare costs to subscribers by coordinating their operations and limiting their activities through, among other things, restrictions in their trademark licenses.

15.     On December 12, 2012, the Judicial Panel on Multidistrict Litigation consolidated and transferred such actions to the United States District Court for the Northern District of Alabama, creating the MDL litigation referred to as *In Re: Blue Cross Blue Shield Antitrust Litigation*, Master File No 2:13-cv-20000-RDP.  A copy of the December 12, 2012 MDL Transfer Order is attached to **Exhibit A** (the Allied World complaint) as Exhibit 1.  In consolidating the individually filed class actions, the MDL Panel found: "Here, the actions involve substantial common questions of fact relating to the state BCBS entities' relationship

with the national association, BCBSA, and the licensing agreements that limit the Blue Plans' activity to exclusive service areas, among other restrictions." MDL Transfer Order.

16. Pursuant to an Order issued by the MDL Court, two consolidated complaints were filed in the MDL Action, one for the "subscriber track" and the other for the "provider track." (Subscriber Track Second Amended Consolidated Class Action Complaint [**Exhibit A,** Allied World complaint, at Exhibit 2] and Subscriber Track Third Amended Consolidated Class Action Complaint [MDL No. 2406, Master File No. 2:13-cv-20000-RDP, DE 1082] (the "Subscriber Complaint")); (Consolidated Third Amended Provider Complaint [**Exhibit A,** Allied World complaint, at Exhibit 3] and Consolidated Fourth Amended Provider Complaint [MDL No. 2406, Master File No. 2:13-cv-20000-RDP, DE 1083] (the "Provider Complaint")).

17. The HCSC entities are named in the Provider and Subscriber Complaints as follows: "Blue Cross and Blue Shield of Illinois," "Blue Cross and Blue Shield of New Mexico," "Blue Cross and Blue Shield of Oklahoma," "Blue Cross and Blue Shield of Texas," and "Blue Cross and Blue Shield of Montana" are named as defendants in the Provider Complaint. "Health Care Service Corporation, d/b/a/ Blue Cross and Blue Shield of Illinois ('BCBS-IL'), Blue Cross and Blue Shield of Montana ('BCBS-MT', including its predecessor Caring for Montanas, Inc.), Blue Cross and Blue Shield of New Mexico ('BCBS-NM'), Blue Cross and Blue Shield of Oklahoma ('BCBS-OK'), and Blue Cross Blue Shield of Texas ('BCBS-TX')" are named as a defendants in the Subscriber Complaint.

18. The Provider Complaint alleges that the Blues have been engaged for many years in an agreement not to compete against one another, but instead to cooperate and coordinate their activities on a nationwide basis in order to maximize their profits. The Provider Complaint contends that the Blues agreed to cease competing and to impose operational uniformity on themselves decades ago by carving out exclusive service areas, setting up their national programs (including Blue Card), and establishing BCBSA's uniform rules and regulations. The Blues allegedly formalized their cooperation agreement through the restrictions in their trademark licenses, such as the requirement of mandatory participation in the national programs.

19.     The asserted conspiracy has allegedly perpetuated and strengthened the dominant market position each Blue enjoys in its specifically defined geographic market which, in turn, has enabled the Blues to force healthcare providers to accept anticompetitive rates and terms. The Provider Complaint alleges that healthcare providers have been subjected to lower rates and less favorable terms than would have been the case in the absence of the conspiracy.

20.     The Provider Complaint seeks injunctive relief prohibiting the Blues, including HCSC, from entering into, honoring, or enforcing any agreements that restrict territories or geographic areas, enjoining the Blues from utilizing the Blue Card Program to pay healthcare providers, and enjoining the Blues from developing any other program or structure that is intended to fix, or has the effect of fixing, prices paid to healthcare providers.  The Provider Complaint also seeks relief in the form of treble damages.

21.     The Subscriber Complaint similarly alleges that the Blues have been engaged for many years in an agreement not to compete against one another, but instead to cooperate and coordinate their activities on a nationwide basis in order to maximize their profits.  The Subscriber Complaint alleges that the Blues agreed to cease competing and to impose operational uniformity on themselves decades ago by carving out exclusive service areas and establishing BCBSA's uniform rules and regulations, including BCBSA's Membership Standards and Guidelines.  The Blues allegedly formalized their cooperation agreement in their trademark licenses.

22.     The Subscriber Complaint seeks injunctive relief prohibiting the Blues, including the HCSC entities, from entering into, honoring, or enforcing any agreements that restrict territories or geographic areas, and it also seeks to eliminate restrictions on the Blues' activities. The complaint further seeks relief in the form of treble damages of the amount by which the plaintiffs allege premiums were artificially inflated above their competitive levels.

23.     The Provider Complaint and the Subscriber Complaint are based upon the same or related conduct of the Blues relating to the Blues' "relationship with the national association, BCBSA, and the licensing agreements that limit the Blue Plans' activity . . . ."   MDL Transfer

Order, **Exhibit A** (Allied World complaint) at Exhibit 1, page 2. The Provider and Subscriber Complaints differ only with respect to the alleged harm to the providers and the subscribers. Both complaints seek damages in excess of this Court's jurisdictional limit and invoke federal question jurisdiction.

### The Prior Related Lawsuit

24. The HCSC entities were also defendants in a prior class action litigation styled *Love v. Blue Cross Blue Shield Assoc. et al.*, No. 03-21296 (S.D. Fla.) (originally titled *Thomas v. Blue Cross Blue Shield Assoc.*). *Love* was a component of the MDL proceeding created in April 2000, and styled *In re Managed Care Litigation*, No. 1:00-MDL-1334 (collectively referred to as the "*Love* Litigation"). A copy of Plaintiffs' Sixth Amended Class Action Complaint in MDL 1334 (referred to herein as the "*Love* Litigation") is attached to **Exhibit A** (the Allied World complaint) as Exhibit 4.

25. Like the present pending MDL Action, the *Love* Litigation was based on the theory that the Blues for many years have not competed against one another, but instead have engaged in an agreement to cooperate and coordinate their activities on a nationwide basis in order to maximize their profits.

26. The *Love* Litigation plaintiffs alleged that the Blues are not competitors, but instead provide health services only in individual distinct geographic regions, and that the individual Blues have market power in their respective regions. The *Love* Litigation plaintiffs further alleged that the Blues use their market power to harm providers by forcing them to accept unfavorable reimbursements.

27. The *Love* Litigation plaintiffs also contended that the Blues agreed to cease competing and to impose operational uniformity on themselves decades ago by agreeing to operate in distinct geographic regions, setting up their national programs (including Blue Card), and establishing BCBSA's uniform rules and regulations.

28. The *Love* Litigation plaintiffs further contended that the Blues formalized their alleged cooperation agreement in their trademark licenses. The *Love* Litigation cites the absence

SMRH:487777316.4

of Blue-on-Blue competition – and the resulting market dominance each Blue has acquired as a result – as well as the operational uniformity among the Blues required by their trademark licenses (including the requirement of mandatory participation in the Blue Card Program) as evidence that the Blues have conspired.

29.     The *Love* Litigation plaintiffs asserted that the Blues engaged in a common scheme to systematically deny, delay, and diminish payments to providers.  Similar to the Provider and Subscriber Complaints, the *Love* Litigation was based on the restrictions in the Blues' trademark licenses, on the Blues' relationship with BCBSA, and on the Blues' long history and practice of national coordination and cooperation.

30.     Many of the Blues, including HCSC, settled the *Love* Litigation through three settlement agreements that became effective on September 26, 2008, October 3, 2008, and June 19, 2009, respectively.

## The Prior Related *Musselman* Lawsuit

31.     The HCSC entities were defendants in a subsequent action styled *Musselman v. Blue Cross Blue Shield of Ala.*, et al., no. 13-20050 (S.D. Fla.) (the "*Musselman* Complaint"), in which plaintiffs sought a declaration that the claims in the MDL Action were not released by the settlement agreements with the Blues, including HCSC, in the *Love* Litigation.  The Blues moved to dismiss the *Musselman* Complaint.

32.     The District Court granted the Blues' Motion to Dismiss finding that the claims in the *Musselman* Complaint were related to and released by the settlement agreements in the *Love* Litigation, thus barring further litigation.  A copy of the Order granting the Blues' Motion to Dismiss is attached hereto as **Exhibit B**.

33.     On the plaintiffs' appeal of the dismissal, the Blues, including HCSC, contended that the allegations in the *Musselman* Complaint involve the same allegations as those made in the *Love* Litigation.

SMRH:487777316.4

## THE INSURANCE POLICIES

### The Allied World Primary Policy

34. Allied World's Primary Policy provides certain coverage to HCSC pursuant to the policy's terms, conditions, and exclusions. The Allied World Primary Policy has a maximum limit of liability of $20 million for each claim and in the aggregate for all claims, as well as a $20 million maximum limit of liability for each claim for antitrust activity and in the aggregate for all claims for antitrust activity pursuant to the policy's terms, conditions, and exclusions. A copy of the Allied World Primary Policy is attached to **Exhibit A** (the Allied World complaint) as Exhibit 5.

35. The Insuring Agreement in the Allied World Primary Policy provides:

The **Underwriter** will pay on behalf of any **Insured Loss** which the **Insured** is legally obligated to pay as a result of a **Claim** that is first made against the **Insured** during the **Policy Period** or during any applicable Extended Reporting Period.

(Allied World Primary Policy, § I.)

36. The term "**Claim**" is defined, in relevant part, as "any written notice received by any **Insured** that a person or entity intends to hold an **Insured** responsible for a **Wrongful Act** which took place on or after the Retroactive Date listed in ITEM 7 of the Declarations." (Allied World Primary Policy, § IV, Definition (C), as amended by Endorsement No. 34.)

37. The term "**Wrongful Act**" is defined, in relevant part, as "any actual or alleged act, error or omission in the performance of, or any failure to perform, a **Managed Care Activity** by any **Insured Entity** or by any **Insured Person** acting with the scope of his or her duties or capacity as such." (Allied World Primary Policy, § IV, Definition (W), as amended by Endorsement Nos. 8, 21, 22, 23 and 28.)

38. The term "**Managed Care Activity**," is defined as:

"**Managed Care Activity**" means any of the following services or activities: **Provider Selection; Utilization Review**; advertising, marketing, selling, or enrollment for health care or workers' compensation plans; **Claim Services**; establishing health care provider networks; reviewing the quality of **Medical Services** or providing quality assurance; design and/or implementation of financial incentive plans; wellness or health promotion education; development

> or implementation of clinical guidelines, practice parameters or protocols; triage for payment of **Medical Services**; and services or activities performed in the administration or management of health care or workers' compensation plans. **Managed Care Activity** shall include all such services and activities listed above, whether provided on paper, in person, electronically, or via any other medium.

(Allied World Primary Policy, § IV, Definition (K), as amended by Endorsement No. 10.)

Through Endorsement No. 5, "**Managed Care Activity**" is amended to include "life or disability insurance products or services; demand management; create computer generated data for customers." (Allied World Primary Policy, Endorsement No. 5.) As amended by Endorsement No. 11, "**Managed Care Activity**" also includes a "Nurse Call Line." (Allied World Primary Policy, Endorsement No. 11.) Pursuant to Endorsement No. 38, "**Managed Care Activity**" also includes "actuarial or analytical consultative data reporting, in support of the health plans or Administrative Services Only ("ASO") plans offered by the **Named Insured**." (Allied World Primary Policy, Endorsement No. 38.)

39. The term "**Related Claims**" means "all **Claims** for **Wrongful Acts** based upon, arising out of, resulting from, or in any way involving the same or related series of facts, circumstances, situations, transactions or events, whether related logically, causally, or in any other way." (Allied World Primary Policy, § IV, Definition (Q).)

40. The term **"Loss"** is defined as:

> **Defense Expenses,** pre- and post-judgment interest, and any monetary amount which an **Insured** is legally obligated to pay as a result of a **Claim**. **Loss** shall not include:
>
> (1) fines, penalties, taxes, and punitive, exemplary or multiplied damages; provided that, loss shall include fines, penalties or punitive or exemplary or multiplied damages awarded in **Claims** for **Antitrust Activity** up to the amount listed in ITEM 3 (b) of the Declarations (which amount is part of, and not in addition to the amount listed in ITEM 3 (a) of the Declarations), but only if such fines, penalties or punitive or exemplary or multiplied damages are insurable under applicable law. [sic]
>
> (2) fees, amounts, benefits or coverage owed under any contract with any party including providers of health care services, health care plan or trust, insurance or workers' compensation policy or plan or program of self-insurance;

(3) non-monetary relief or redress in any form, or equitable relief including without limitation the restitution or disgorgement of funds or the cost of complying with any injunctive, declaratory or administrative relief; with regard to government claims involving fraud and abuse type activities such as or in connection with Medicare/Medicaid, only **Defense Expenses** will be covered; or

(4) matters which are uninsurable under applicable law.

Determination of the insurability of any **Loss** shall be made under the laws most favorable to the insurability of **Loss** of either: (a) of the jurisdiction of the **Named Insured's** principal place of business, or (b) the jurisdiction where the **Wrongful Act** giving rise to such **Loss** occurred.

(Allied World Primary Policy, § IV, Definition (J), as amended by Endorsement Nos. 13 and 15.)

Pursuant to Endorsement No. 14, "**Loss**" is amended to also include "fines and penalties imposed under [HIPAA] or any similar federal, state or local information privacy laws or regulations, but only if such fines and penalties are insurable under the applicable law. . . " (Allied World Primary Policy, Endorsement 14.)

41.     The Allied World Primary Policy provides that, except for **Defense Expenses**, Allied World shall not pay **Loss** for any **Claim** brought about or contributed to by:

(1) any willful misconduct or dishonest, fraudulent, criminal or malicious act, error or omission, committed intentionally by any **Insured**;

(2) any willful violation by any **Insured** of any law, statute, ordinance, rule or regulation; or

(3) any **Insured** gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled.

For the purposes of determining the applicability of this EXCLUSION (A); no **Wrongful Act** of any **Insured** shall be imputed to any other **Insured**. Determination of the applicability of this EXCLUSION (A) may be made by an admission under oath, or a final adjudication, in a proceeding constituting the **Claim**, or in a proceeding separate from and collateral to any proceeding constituting the **Claim**.

(Allied World Primary Policy, § II, Exclusion (A), as amended by Endorsement No. 32.)

42.     The Allied World Primary Policy contains Exclusion (C)(8) (the "Prior and Pending Exclusion"), which provides:

(C) The **Underwriter** shall not pay any **Loss**, including **Defense Expenses**, for any **Claim**:

\* \* \*

-12-

(8) based upon, arising out of, resulting from, or in any way involving any fact, circumstance, situation, transaction, event, **Wrongful Act** or series of facts, circumstances, situations, transactions, events or **Wrongful Acts**:

    (a) underlying or alleged in any litigation or administrative or regulatory proceeding brought prior to and/or pending as of the Inception Date stated in ITEM 2(a) of the Declarations [January 1, 2012]:

        (i) to which any **Insured** was a party; or

        (ii) with respect to which any **Insured**, as of the Inception Date, knew that an **Insured** would be made a party thereto;

    (b) which was the subject of any notice given prior to the Inception Date under any other policy of insurance or plan or program of self-insurance; or;

    (c) which was the subject of any **Claim** made prior to the Inception Date;

if, however, this Policy is a renewal of one or more policies previously issued by the **Underwriter** to the **Insured Entity**, and the coverage provided by the **Underwriter** to the **Insured Entity** was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date of this Policy, the reference in this EXCLUSION (C)(8) to the Inception Date will be deemed to refer instead to the inception date of the first policy under which the **Underwriter** began to provide the **Insured Entity** with the continuous and uninterrupted coverage of which this Policy is a renewal;

(Allied World Primary Policy, § II, Exclusion (C)(8).)

43.    The Allied World Primary Policy contains Exclusion (C)(9), which provides:

(C) The **Underwriter** shall not pay any **Loss**, including **Defense Expenses**, for any **Claim**:

* * *

    (9) **against**:

        (a) any **Subsidiary**;

        (b) any other entity acquired by the **Insured Entity** whether by merger, consolidation, asset acquisition or otherwise; or

        (c) any Insured Person of any entity in (a) or (b) above:

        for any **Wrongful Act** committed during any time in which such entity is not a **Subsidiary**, or at any time before any such acquisition by the **Insured Entity**;

(Allied World Primary Policy, § II, Exclusion (C)(9).)

SMRH:487777316.4

44.     The term "**Subsidiary**" means:

(1)  any entity during such time in which the **Named Insured** maintains "Management Control," including but not limited to any entity organized as a corporation, limited liability company or partnership and any entity that is tax-exempt under any section of the IRS Code.

For the purpose of this DEFINITION (S), "Management Control" means that the **Named Insured**, directly or through one or more **Subsidiaries**, has:

(a)  Ownership interests representing more than 50% of the voting rights for the selection of the entity's board of directors (or equivalent);

(b)  The ability to control the rights to designate a majority of the Board of Directors of the entity (or equivalent); or

(c)  Greater than 50% of the ownership interests in an entity which is a corporation or limited liability company, or more than 50% of the voting rights of an entity which is a partnership;

A **Subsidiary** shall also include any **Insured Entity** in its capacity as a participant in any joint venture, but only to the extent of its ownership interests in such joint venture, and solely with respect to **Claims** arising out of the **Insured Entity's** performance of **Managed Care Activities** for such joint venture; Provided that any such coverage for a **Claim** shall be excess over any valid and collectible insurance available to the joint venture and its participants.

(Allied World Primary Policy, § IV, Definition (S), as amended by Endorsement 30.)

45.     The Allied World Primary Policy includes the following Condition (B):

The **Underwriter** will require a **Litigation Plan**, as defined below, as part of the initial evaluation of a **Claim**, or circumstances which might give rise to a **Claim**, which **Litigation Plan** shall be updated on a quarterly basis, or as developments occur in the **Claim** or circumstance, whichever is more frequent.

(Allied World Primary Policy, § III, Condition (B), as amended by Endorsement 24.)

46.     The Allied World Primary Policy defines "**Litigation Plan**" as:

"**Litigation Plan**" means a written document provided to the **Underwriter** which includes:

(a) an assessment of liability;

(b) the amount and nature of the damages sought;

(c) the strategy for the conduct of a defense effort, considering resources and

procedures required to fulfill all objectives;

(d) an estimate of cost, including a preliminary projection of time and fees to be incurred for the strategy;

(e) the probability of a verdict in favor of the plaintiff;

(f) the verdict range;

(g) a description of any discovery developments, including deposition summaries;

(h) the probable apportionment of the verdict or settlement among co-defendants;

(i) the current settlement value;

(j) a summary of any settlement opportunities, including, but not limited to, mediation or settlement conferences, including pertinent dates and times;

(k) the estimated trial date and time;

(l) any other pertinent information in connection with the resources and efforts listed in paragraphs (a)-(k) above.

(Allied World Primary Policy, § IV, Definitions, as added by Endorsement 24.)

47.     The Allied World Primary Policy includes the following Condition (C):

All **Related Claims,** whenever made, shall be deemed to be a single **Claim** and shall be deemed to have been first made on the earliest of the following dates:

(1) the date on which the earliest **Claim** within such **Related Claims** was received by an **Insured;** or

(2) the date on which written notice was first given to the **Underwriter** of a **Wrongful Act** which subsequently gave rise to any of the **Related Claims,** regardless of the number and identity of claimants, the number and identity of **Insureds** involved, or the number and timing of the **Related Claims,** even if the **Related Claims** comprising such single **Claim** were made in more than one **Policy Period.**

(Allied World Primary Policy, § III, Condition (C).)

48.     The Allied World Primary Policy includes the following Condition (D)(3):

The **Underwriter** will, upon written request, pay **Defense Expenses** for which this Policy provides coverage on a current basis.  As a condition precedent to payment of any **Defense Expenses** before the final disposition of a **Claim,** the **Underwriter** may require a written undertaking, on terms and conditions satisfactory to the **Underwriter,** guaranteeing the repayment of any **Defense Expenses** paid on behalf of the **Insured** if it is finally determined that this Policy would not provide coverage for such **Claim.**  Except for **Defense Expenses** paid in accordance with this CONDITION (D)(3), the **Underwriter** will have no obligation to pay or reimburse any **Loss** before the final disposition of a **Claim.**  If some, but not all, of the allegations in any **Claim** give rise to **Loss** for which this Policy provides coverage, the **Insureds** and the **Underwriter** shall use their best efforts to arrive at a fair and equitable allocation of any fees, costs and expenses, and settlement amounts based upon relative exposure incurred in connection with such **Claim.**

(Allied World Primary Policy, § III, Condition (D)(3), as amended by Endorsement No. 20.)

49.    The Allied World Primary Policy includes the following Condition (E):

In the event of a **Claim**, the **Insureds** shall provide the **Underwriter** with all information, assistance and cooperation that the **Underwriter** reasonably requests.

(Allied World Primary Policy, § III, Condition (E).)

## **The Travelers Policy**

50.    Travelers Excess and Surplus Lines Company ("Travelers") issued an Excess Managed Care Organization Errors and Omissions Liability Insurance Policy, policy number 103996357 to HCSC for the policy period January 1, 2012 through January 1, 2013, that provides certain coverage to HCSC in excess of this Court's jurisdictional threshold pursuant to the policy's terms, conditions, and exclusions (the "Travelers Policy").  The Travelers Policy is the first excess policy over Allied World's Primary Policy and provides $20 million in coverage, in excess of Allied World's $20 million, pursuant to the policy's terms, conditions, and exclusions.  A copy of the Travelers Policy is attached hereto as **Exhibit C**.

51.    The Travelers Policy contains the following Insuring Agreement:

In consideration of the payment of the premium, and in reliance upon the completeness and accuracy of the statements and disclosures made to the Insurer and any issuer of Underlying Insurance by application, including all attachments, the Insurer agrees that this policy incorporates by reference, and affords coverage in accordance with and subject to, the insuring clauses, warranties, definitions, terms, conditions, exclusions and other provisions contained in the Followed Policy and to the extent coverage is further limited or restricted thereby, in any other Underlying Insurance, except as regards the premium, the limit of liability, the policy period, and except as otherwise provided herein. In no event shall this policy grant broader coverage than would be provided by the most restrictive Underlying Insurance.

To the extent the insuring clauses, warranties, definitions, terms, conditions, exclusions or other provisions of the Followed Policy or other Underlying Insurance are changed to limit or restrict coverage, this policy shall become subject to such changes upon the effective date of the change in the Followed Policy or such other Underlying Insurance. To the extent the insuring clauses, warranties, definitions, terms, conditions, exclusions or other provisions of the Followed Policy are changed to expand or broaden coverage, this policy shall become subject to such changes only if: (i) the Insurer has received written notice from the Insured(s) of such changes; (ii) the Insurer has given the Insured(s) its

-16-

written consent to such changes; and (iii) the Insured(s) has paid any required additional premium.

(Travelers Policy, Insuring Agreement.)

52.     The Travelers Policy defines "Followed Policy" as "the policy or bond listed in Item 4 of the Declarations, but only for the coverage sections listed."  (Travelers Policy, § I, Definition (B).)

53.     Item 4 of the Travelers Policy identifies the Allied World Primary Policy as the "Followed Policy."  (Travelers Policy, Declarations, Item 4.)

54.     Item 5 of the Travelers Policy identifies the Allied World Primary Policy as the "Underlying Insurance."  (Travelers Policy, Declarations, Item 5.)

55.     The Travelers Policy contains the following Attachment and Limit of Liability provision:

> The Insurer shall only be liable to make payment under this policy after the total amount of all Underlying Limits of Liability has been paid in legal currency by the issuers of all Underlying Insurance as covered loss thereunder.

(Travelers Policy, § III, Attachment and Limit of Liability (A).)

### The Homeland Policy

56.     Homeland issued an Excess Managed Care Organization Errors and Omissions Liability Insurance Policy, policy number MCX-1756-12 to HCSC for the policy period January 1, 2012 through January 1, 2013, that provides certain coverage to HCSC in excess of this Court's jurisdictional threshold pursuant to the policy's terms, conditions, and exclusions (the "Homeland Policy").  The Homeland Policy provides $20 million in coverage per claim and in the aggregate in excess of $40 million pursuant to the policy's terms, conditions, and exclusions. A copy of the Homeland Policy is attached hereto as **Exhibit D**.

57.     The Homeland Policy is a "follow form excess policy."  Insuring Agreement (A) provides:

> The Underwriter shall provide the **Insured** with insurance excess of the **Underlying Insurance** set forth in ITEM 4 of the Declarations, provided that the **Underlying Insurance** also applies and has been exhausted by actual payment

thereunder, or would apply but for the exhaustion of the applicable limit(s) of liability thereunder.

(Homeland Policy, § I, Insuring Agreement (A).)

58. Endorsement 1 to the Homeland Policy defines "**Underlying Insurance**" as the

Allied World Primary Policy and the Travelers Policy. (Homeland Policy, Endorsement 1.)

59. The Homeland Policy includes the following Insuring Agreement (D):

This Policy will apply in conformance with, and will follow the form of, the terms, conditions, agreements, exclusions, definitions and endorsements of the **Underlying Insurance,** except:

> (1) the Underwriter will have no obligation under this Policy with respect to any **Claim** that is settled without the Underwriter's written consent;

> (2) with respect to any provisions to the contrary contained in this Policy;

> (3) the applicable limit of liability of the **Underlying Insurance** shall be deemed to be reduced or exhausted solely as a result of payments for loss or damages (including costs, charges and expenses) that are covered under this Policy; and

> (4) the coverage provided by this Policy shall not be broader than any **Underlying Insurance** unless expressly provided herein, including any endorsement hereto.

(Homeland Policy, § I, Insuring Agreement (D).)

60. The Homeland Policy includes the following Insuring Agreement (E):

The Underwriter will not have any obligation to make any payment hereunder unless and until the full amount of the applicable limit of liability of the **Underlying Insurance** has been paid by the issuer(s) of the **Underlying Insurance,** the **Insured** or by another party on behalf, or for the benefit, of the **Insured** or the issuer(s) of the **Underlying Insurance**.

(Homeland Policy, § I, Insuring Agreement (E).)

61. The Homeland Policy is a "claims-made" policy with respect to Professional

Liability coverage. Insuring Agreement (B) provides:

With respect to any coverage provided by the **Underlying Insurance** on a claims-made basis, this Policy applies only to **Claims** first made against the **Insured** during the **Policy Period**. In all events, Professional Liability coverage shall be deemed to apply on a claims-made basis.

(Homeland Policy, § I, Insuring Agreement (B).)

62. The Homeland Policy contains the following Definitions (B)-(G):

"**Claim**" has the meaning ascribed to it (or similar term) in the **Underlying Insurance**.

"**Defense Expenses**" has the meaning ascribed to it (or similar term) in the **Underlying Insurance**.

"**Insured**" means the persons or organizations insured under the **Underlying Insurance**.

"**Policy Period**" means the period from the inception date to the expiration date in ITEM 2 of the Declarations, or to any earlier cancellation date.

"**Primary Policy**" means the policy scheduled as such in ITEM 4 of the Declarations.

"**Underlying Insurance**" means all insurance policies or risk transfer instruments (including, but not limited to, self-insured retentions or other alternative arrangements) scheduled in ITEM 4 of the Declarations and any policies or risk transfer arrangements renewing or replacing them.

(Homeland Policy, § II, Definitions (B)-(G).)

63.    The Homeland Policy includes the following Underlying Insurance provision (C):

No amendment or modification to any **Underlying Insurance** shall be binding upon the Underwriter or effective in extending the coverage or limits of liability afforded by this Policy without the express written agreement of the Underwriter.

(Homeland Policy, § III, Underlying Insurance (C).)

64.    The Homeland Policy contains the following Limit of Liability provision:

The amount stated in ITEM 3 of the Declarations is the limit of the Underwriter's liability under this Policy, and shall be the maximum amount, including **Defense Expenses**, payable by the Underwriter under this Policy. The limit of liability available to pay damages or settlements shall be reduced, and may be exhausted, by the payment of **Defense Expenses.**

(Homeland Policy, § IV, Limit of Liability.)

65.    The Homeland Policy contains the following Defense Expenses and Settlements provision:

In the event a **Claim** is made which involves the coverage afforded by this Policy, no **Defense Expenses** shall be incurred without the Underwriter's prior written consent, which consent shall not be unreasonably withheld.

The **Insured** shall not admit liability for, or settle or offer to settle any **Claim** for, any amount that would involve the coverage afforded by this Policy without the Underwriter's prior written consent.

SMRH:487777316.4

(Homeland Policy, § V, Defense Expenses and Settlements.)

66.     The Homeland Policy contains the following Claim Participation provision:

The Underwriter may, at its sole discretion, elect to associate in the investigation, settlement or defense of any **Claim** against the **Insured**, even if the **Underlying Insurance** has not been exhausted.  If the Underwriter so elects, the **Insured** will cooperate with the Underwriter and will make available all such information and records as the Underwriter may reasonably require.

(Homeland Policy, § VI, Claim Participation.)

67.     The Homeland Policy contains the following Subrogation and Recoveries

provision:

In the event of any payment under this Policy, the Underwriter will be subrogated to all the **Insured's** rights of recovery against any person or entity, and the **Insured** shall execute and deliver all instruments and papers and do whatever else is necessary to secure such rights. The **Insured** shall do nothing that may prejudice the Underwriter's position or potential or actual right of recovery. The obligations of the **Insured** under this provision shall survive the expiration or termination of this Policy.

(Homeland Policy, § VII, Subrogation and Recoveries, as amended by Endorsement 5.)

## NATURE OF THE CONTROVERSY

68.     HCSC provided notice of the antitrust class action complaints and subsequently

the Provider and Subscriber Track complaints to its insurers requesting coverage under their

policies.

69.     There is an actual controversy of a judicial nature between Homeland and HCSC

involving the parties' rights and liabilities under the Homeland Policy which provides E&O

liability insurance to HCSC and follows form to Allied World's Primary Policy.

70.     Despite Homeland's requests, HCSC refuses to provide reasonably requested

information necessary for Homeland to (1) assess HCSC's potential liability in the class action

lawsuits consolidated in the MDL Action and to (2) make determinations regarding coverage.

There is thus a bona fide present dispute between Homeland and HCSC regarding the scope of

the obligations of the parties under the Claim Participation/Assistance and Cooperation clauses.

71.     There are thus bona fide present disputes between Homeland and HCSC

regarding:

a. Whether the *Love* Litigation is a Related Claim under the Homeland Policy, and as defined in the Allied World Primary Policy, barring coverage as a claim made prior to the inception date of both policies;

b. whether the Prior and Pending Exclusion bars coverage;

c. the scope of the obligations of the parties under the Claim Participation/Assistance and Cooperation clauses;

d. whether HCSC breached the Claim Participation/Assistance and Cooperation clauses;

e. whether HCSC's breach of the Claim Participation/Assistance and Cooperation clauses bars coverage;

f. whether Homeland is entitled to specific performance under the Claim Participation/Assistance and Cooperation clauses in the form of specific information and documents, including but not limited to any documents relating to coverage settlement agreements that could impact when or how Homeland's Policy is triggered;

g. whether Homeland has any obligation to pay under the Homeland Policy unless and until it is established that the underlying policy limits have been exhausted by actual payments for covered loss for covered entities; and

h. whether Homeland is entitled to the relief sought by Allied World in its complaint on issues affecting Homeland because the Homeland Policy follows form to the Allied World Primary Policy.

SMRH:487777316.4

## FIRST COUNT

### (Declaratory Relief Against HCSC: Related Claim)

72.     Homeland hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 71 of this Complaint.

73.     An actual controversy exists between Homeland, on the one hand, and HCSC, on the other, with respect to whether the *Love* Litigation is a Related Claim under the Homeland Policy, as defined in the Allied World Primary Policy:

> "**Related Claims**" means all **Claims** for **Wrongful Acts** based on, arising out of, resulting from, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances situations, transactions or events, whether related logically, causally or in any other way.

(Allied World Primary Policy, § IV, Definition (Q).)

74.     Homeland is entitled to a declaratory judgment in its favor, stating that the *Love* Litigation is a Related Claim with respect to the claim made under the Homeland Policy, barring coverage as a claim first made prior to the inception of both the Homeland Policy and the Allied World Primary Policy.

## SECOND COUNT

### (Declaratory Relief Against HCSC: Prior and Pending Exclusion)

75.     Homeland hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 74 of this Complaint.

76.     An actual controversy exists between Homeland, on the one hand, and HCSC, on the other, with respect to whether the Prior and Pending Exclusion bars coverage:

> (C) The **Underwriter** shall not pay any **Loss**, including **Defense Expenses**, for any **Claim**:
>
> * * *
>
> (8) based upon, arising out of, resulting from, or in any way involving any fact, circumstance, situation, transaction, event, **Wrongful Act** or series of facts, circumstances, situations, transactions, events or **Wrongful Acts**:

SMRH:487777316.4

    (a) underlying or alleged in any litigation or administrative or regulatory proceeding brought prior to and/or pending as of the Inception Date stated in ITEM 2(a) of the Declarations [January 1, 2012]:

        (i) to which any **Insured** was a party; or

        (ii) with respect to which any **Insured**, as of the Inception Date, knew that an **Insured** would be made a party thereto;

    (b) which was the subject of any notice given prior to the Inception Date under any other policy of insurance or plan or program of self-insurance; or

    (c) which was the subject of any **Claim** made prior to the Inception Date;

(Allied World Primary Policy, § II, Exclusion (C)(8).)

77.     Homeland is entitled to a declaratory judgment in its favor, stating that the Prior and Pending Exclusion bars coverage.

### THIRD COUNT

### (Declaratory Relief Against HCSC: Duties Under Cooperation Provision of Homeland Policy)

78.     Homeland hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 77 of this Complaint.

79.     An actual controversy exists between Homeland, on the one hand, and HCSC, on the other, with respect to the parties' duties and obligations under the Homeland Policy (and by extension the Allied World Primary Policy described above).  Because Homeland has elected to associate in the investigation of the MDL Action, Homeland contends that HCSC must comply with the following Claim Participation clause in the Homeland Policy:

> The Underwriter may, at its sole discretion, elect to associate in the investigation, settlement or defense of any **Claim** against the **Insured**, even if the **Underlying Insurance** has not been exhausted. If the Underwriter so elects, the **Insured** will cooperate with the Underwriter and will make available all such information and records as the Underwriter may reasonably require.

(Homeland Policy, § VI, Claim Participation.)

SMRH:487777316.4

80.     Similarly, Homeland contends that HCSC must comply with the following Assistance and Cooperation clause in the Allied World Primary Policy, to which the Homeland Policy follows form:

> In the event of a **Claim**, the **Insureds** shall provide the **Underwriter** with all information, assistance and cooperation that the **Underwriter** reasonably requests.

(Allied World Primary Policy, § III, Condition (E).)

81.     Homeland also contends that the Claim Participation and Assistance and Cooperation clauses require HCSC to provide information and documents reasonably requested including, but not limited to:

a.  All written analyses or reports relating to HCSC's potential exposure (including assessment of settlement value of the Subscriber and Provider Track claims);

b.  All analyses of the liability allocation percentage for HCSC;

c.  A list of all persons deposed in the MDL Action and their employer/affiliation;

d.  Summaries of all depositions taken in the MDL Action;

e.  Any analyses of the impact of depositions taken in the MDL Action;

f.  Any analyses regarding expert witnesses (including expert disclosures, reports and depositions) involved in the MDL Action;

g.  Any analyses of the impact of recent rulings in the MDL Action including, but not limited to, the standard of review issue in the MDL Action;

h.  Any discovery requests and responses thereto from the MDL Action that have not been provided;

i.  All privilege logs served in the MDL Action, including but not limited to the privilege log as certified in November of 2017;

j.  All documents produced by HCSC in the MDL Action;

k.  Any key documents (meaning those identified by HCSC or other counsel for the Blues as having an impact on the merits of the MDL Action) produced, obtained or received in discovery;

l.  All analyses of settlement offers or demands in the MDL Action;

m.  Any communications regarding allocation of liability between HCSC and other defendants in the underlying litigation, including regarding any formula that has been proposed to HCSC to determine its allocation of any settlement or judgment;

n.  Any communications regarding the expected contribution or percentage allocation of any settlement to the Association in the MDL Action;

o.  Any internal communications regarding allocation of any aggregate settlement among potentially covered and uncovered causes of action in the MDL Action (excluding any communications between HCSC and its coverage counsel, Reed Smith LLP);

p.  Any communications regarding any allocation of any aggregate settlement among the requested relief and damages in the MDL Action;

q.  All Term Sheets exchanged in the MDL Action and related to potential settlement of the MDL Action;

r.  All written agreements, including licensing agreements, between HCSC and the Association;

s.  All communications received by HCSC relating to the class action complaints and the MDL Action prior to retention of defense counsel;

t.  All information, analysis, reports, power point presentations or other documents regarding potential claims in the MDL Action concerning ASOs (including the value of such claims, damage estimates and the value of any release of ASO claims in any settlement);

u.  Any communications with an ASO relating to the MDL Action; and

v.  Any term sheet, mediator's proposal, settlement agreement, or other written agreement entered into by HCSC to resolve any insurance coverage issues with respect to the antitrust class actions and MDL Action with Allied World or any other insurer.

SMRH:487777316.4

82.     To date, and despite request by Homeland, HCSC has not provided the majority of the information or documents described in the preceding Paragraph.  Therefore, an actual controversy presently exists between Homeland and HCSC regarding the parties rights and obligations and HCSC's compliance with the cooperation clauses in the policies.

83.     Homeland is entitled to a declaratory judgment in its favor, stating HCSC must comply with the Claim Participation and Assistance and Cooperation clauses in order to be entitled to any coverage under the Homeland Policy.  Moreover, Homeland requests a declaratory judgment concerning the scope of the rights and obligations of the parties under the applicable Claim Participation and Assistance and Cooperation clauses.

## FOURTH COUNT

### (Breach of Contract Against HCSC: Cooperation Provision of Homeland Policy)

84.     Homeland hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 83 of this Complaint.

85.     The Homeland Policy is a valid and enforceable contract.

86.     Homeland has performed all conditions, covenants and promises required on its part to be performed under the Homeland Policy.

87.     HCSC refuses to provide reasonably requested and  relevant information and documents necessary for Homeland's coverage investigation in breach of the Claim Participation and Assistance and Cooperation clauses in the Homeland and Allied World Primary Policies.

88.     As a result of HCSC's breach of the contract, Homeland has been damaged in an amount to be determined at trial.

## FIFTH COUNT

### (Declaratory Relief Against HCSC: No Coverage Due to Breach of Cooperation Provision of Homeland Policy)

89.     Homeland hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 88 of this Complaint.

SMRH:487777316.4

90.     An actual controversy exists between Homeland, on the one hand, and HCSC, on the other, with respect to whether HCSC breached the Homeland Policy's Claim Participation provision and the Allied World Primary Policy's Assistance and Cooperation provision, and whether this breach bars coverage.

91.     The cooperation provision obligates the insured to disclose all of the facts within its knowledge and otherwise to aid the insurer in its determination of coverage under the policy.

92.     HCSC refuses to provide reasonably requested and  relevant information and documents necessary for Homeland's coverage investigation in breach of the Claim Participation and Assistance and Cooperation clauses in the Homeland and Allied World Primary Policies.

93.     HCSC's breach of the cooperation provision has substantially prejudiced Homeland in connection with the underlying class action antitrust complaints and the MDL Action.

94.     Homeland is entitled to a declaratory judgment in its favor, stating that HCSC's breach of the Claim Participation and Assistance and Cooperation clauses bars coverage.

## SIXTH COUNT

### (Breach of Contract Against HCSC: Specific Performance)

95.     Homeland hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 94 of this Complaint.

96.     The Homeland Policy is a valid and enforceable contract.

97.     Homeland has performed all conditions, covenants and promises required on its part to be performed under the Homeland Policy.

98.     HCSC continues to refuse to produce reasonably requested and relevant documents necessary for Homeland's coverage investigation in breach of the Claim Participation and Assistance and Cooperation clauses in the Homeland and Allied World Policies.

99.     Homeland has no adequate remedy at law to obtain these documents.  Monetary damages are inadequate.

SMRH:487777316.4

100.    Homeland will suffer irreparable injury absent HCSC's cooperation as required by the Homeland Policy.

101.    Homeland should therefore be granted specific performance pursuant to the Claim Participation and Assistance and Cooperation clauses in the Homeland and Allied World Primary Policies and be provided with the information and documents necessary for a coverage determination.

## SEVENTH COUNT

### (Declaratory Relief Against HCSC: Exhaustion of Underlying Limits)

102.    Homeland hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 101 of this Complaint.

103.    An actual controversy exists between Homeland, on the one hand, and HCSC, on the other, with respect to the rights and obligation of the parties regarding proper exhaustion through payment of covered loss for covered entities pursuant to the following Insuring Agreement provision under the Homeland Policy:

> This Policy will apply in conformance with, and will follow the form of, the terms, conditions, agreements, exclusions, definitions and endorsements of the **Underlying Insurance,** except:
>
> ***
>
> (3) the applicable limit of liability of the **Underlying Insurance** shall be deemed to be reduced or exhausted solely as a result of payments for loss or damages (including costs, charges and expenses) that are covered under this Policy; . . .

(Homeland Policy, § I, Insuring Agreement (D).)

104.    Homeland is entitled to a declaratory judgment in its favor, stating that the Homeland Policy is not triggered and Homeland has no obligation to pay unless and until the limits of the underlying policies are demonstrated to be exhausted through the actual payment for covered loss for covered entities.

SMRH:487777316.4

**WHEREFORE**, Homeland prays for relief as follows:

1.      For a declaration of the rights, duties, and obligations of the parties herein as follows:

        a.   That the *Love* Litigation is a Related Claim under the Homeland Policy, and as defined in the Allied World Primary Policy, barring coverage as a claim made prior to the inception date of both policies;

        b.   That the Prior and Pending Exclusion bars coverage;

        c.   That Homeland is entitled to HCSC's cooperation under the Homeland Policy including, but not limited to, the specific documents and information requested in Paragraph 81 including any memorandum of understanding or settlement agreement purporting to settle the issues raised in the Related Claim;

        d.   That HCSC breached the Claim Participation/Assistance and Cooperation clauses;

        e.   That there is no coverage due to HCSC's breach of the Claim Participation/Assistance and Cooperation clauses;

        f.   For specific performance by way of production of information and documents required by the Claim Participation/Assistance and Cooperation clauses;

        g.   That Homeland has no obligation to pay under the Homeland Policy unless and until it is established that the underlying policy limits have been exhausted by actual payments for covered loss for covered entities; and

        h.   That Homeland is entitled to the relief sought by Allied World in its complaint on issues affecting Homeland because the Homeland Policy follows form to the Allied World Primary Policy;

2.      For costs of suit; and

3.      For such other and further relief as the Court may deem just and proper.

SMRH:487777316.4

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

Respectfully submitted this 14th day of September, 2018.

*/s/ Kevin M. Cloutier*

Kevin M. Cloutier (Illinois Bar No. 6273805)
Mikela T. Sutrina (Illinois Bar No. 6311408)
Sheppard, Mullin, Richter & Hampton LLP
70 West Madison Street, 48th Floor
Chicago, IL 60602
kcloutier@sheppardmullin.com
msutrina@sheppardmullin.com
Phone: (312) 499-6300
Facsimile: (312) 499-6301
*Attorneys for Plaintiff Homeland Insurance*
*Company of New York*

SMRH:487777316.4