IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HOMELAND INSURANCE COMPANY OF NEW YORK, | ) |
| | ) |
| | ) 18 C 6306 |
| Plaintiff, | ) |
| | ) Judge Gary Feinerman |
| vs. | ) |
| | ) |
| HEALTH CARE SERVICE CORP., d/b/a BLUE CROSS BLUE SHIELD OF ILLINOIS, d/b/a BLUE CROSS BLUE SHIELD OF NEW MEXICO, d/b/a BLUE CROSS BLUE SHIELD OF OKLAHOMA, d/b/a BLUE CROSS BLUE SHIELD OF TEXAS, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Homeland Insurance Company of New York seeks in this diversity suit a declaratory judgment that Health Care Service Corporation ("HCSC"), its insured, is not entitled to coverage in several lawsuits consolidated for pretrial proceedings in the MDL styled *In re Blue Cross Blue Shield Antitrust Litigation*, MDL 2406, Master File No. 2:13-cv-20000-RDP (N.D. Ala.). Doc. 59. The complaint alleges that coverage is barred under the Homeland policy's Related Claims, Cooperation, and Exhaustion provisions, and its Prior and Pending exclusion. *Ibid*. With discovery complete, the parties cross-move for summary judgment as to the Related Claims, Cooperation, and Exhaustion provisions, and HCSC moves for summary judgment as to the Prior and Pending exclusion. Docs. 164, 168, 181, 184, 202. And HCSC moves the court to take judicial notice of several publicly available court filings. Doc. 180.

HCSC's motion to take judicial notice is granted. *See 520 S. Michigan Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1137 n.14 (7th Cir. 2008) ("A court may take judicial notice of … documents contained in the public record.") (internal quotation marks omitted); *In re Salem*, 465

F.3d 767, 771 (7th Cir. 2006) ("We begin with the New York cases; we take judicial notice of these dockets and opinions.").  With respect to the Related Claims provision, Homeland's summary judgment motion is granted as to the MDL's Provider Track and denied as to the MDL's Subscriber Track, and HCSC's summary judgment motion is granted as to the Subscriber Track and denied as to the Provider Track.  With respect to the Prior and Pending exclusion, HCSC's summary judgment motion is granted as to the Subscriber Track and denied as to the Provider Track.  With respect to the Cooperation and Exhaustion provisions, Homeland's summary judgment motions are denied, and HCSC's summary judgment motions are granted.  All told, on summary judgment, the court declares that Homeland has no coverage obligation to HCSC as to the Provider Track, but makes no such declaration as to the Subscriber Track.

## Background

Because the parties cross-move for summary judgment, the court will view the disputed facts in the light most favorable to HCSC when considering Homeland's motions and in the light most favorable to Homeland when considering HCSC's motions.  *See First State Bank of Monticello v. Ohio Cas. Ins. Co*., 555 F.3d 564, 567 (7th Cir. 2009) ("[B]ecause the district court had cross-motions for summary judgment before it, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted).  At this juncture, the court must assume the truth of those facts, but does not vouch for them.  *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

### A.    The *Love* Litigation

In 2003, healthcare providers sued the Blue Cross Blue Shield Association (the "Association") and several Blue Cross and/or Blue Shield entities ("Blue Plans"), including HCSC, in *Thomas v. Blue Cross & Blue Shield Association*, Case No. 1:03-cv-21296 (S.D. Fla.), a class action alleging that the Blue Plans and the Association engaged in a "common scheme

[to] systemically deny, delay and diminish the payments due to physicians," in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*. Doc. 165-10 at ¶ 5; Doc. 216 at ¶¶ 1, 3; Doc. 228 at ¶¶ 38, 41. In 2007, HCSC settled the claims against it. Doc. 216 at ¶ 2. Other Blue Plans remained as defendants, and the case later was restyled *Love v. Blue Cross & Blue Shield Association*. Doc. 228 at ¶ 38.

At the time HCSC settled, the operative complaint was the fifth amended complaint. *Id*. at ¶ 39. That complaint alleged that the defendants engaged in a "common scheme" to "deny, delay and diminish" payments to providers, and that they effectuated that scheme by "covertly denying payments to physicians" based on cost rather than medical necessity, by "processing physicians' bills using automated programs which manipulate standard coding practices to artificially reduce the amount the physicians are paid, and by systematically delaying payments." *Id*. at ¶ 42; Doc. 165-10 at ¶¶ 5-6. The complaint further alleged that the Blue Plans "control[led] a large percentage of the subscribers and providers in the managed care market in most states and in some local areas," and that they perpetuated the scheme by "us[ing] their overwhelming economic power and market dominance to coerce [physicians], at the risk of being denied patient referrals and/or 'black-listed' altogether, into providing care under Defendants' policies and practices on a 'take it or leave it' basis." Doc. 228 at ¶ 47; Doc. 165-10 at ¶¶ 282-283. According to the complaint, the Blue Plans "further wield[ed] their economic power and market dominance by reserving the right to unilaterally amend contracts with physicians, refusing to provide information concerning pricing or fee structures to [physicians], and failing to provide any feasible mechanism for review of the automated payment reductions—all in furtherance of the scheme." Doc. 228 at ¶ 47; Doc. 165-10 at ¶ 284. The Association allegedly facilitated the scheme by disseminating to the Blue Plans information on "claims

processing, utilization management and provider contracting," encouraging the Blue Plans to engage actuarial companies that prioritized cutting costs over appropriate medical care, hosting a software system that "conduct[ed] all transfers of funds between the Plans," and facilitating concerted action and communication among the Blue Plans by producing manuals and reports and hosting committees, conferences, and listservs. Doc. 228 at ¶ 47; Doc. 165-10 at ¶¶ 37-41.

After HCSC settled, the *Love* plaintiffs filed a sixth amended complaint. Doc. 216 at ¶ 3. That complaint added the allegation that the Blue Plans "are not competitors; rather they are all licensees of the Association who operate in distinct geographical regions." Doc. 228 at ¶ 47; Doc. 165-5 at ¶ 164. The complaint further alleged that each Blue Plan was required to participate in the BlueCard program, through which members of any given Blue Plan—the "home plan"—could access the services of physicians providing care under Blue Plans in other States—the "host plans"—at the discounted rate negotiated by the host plan. Doc. 228 at ¶ 47; Doc. 165-5 at ¶¶ 19, 21-23, 202. According to the complaint, the BlueCard program allowed Blue Plans to "share extensive claims processing, pricing and adjudication information with each [] other in furtherance of their conspiracy to deny, reduce and delay reimbursements to physicians," and "facilitate[d] the exchange of information on a macro level" to further the conspiracy by enabling quarterly meetings of a "BlueCard Executive Committee" that "discusse[d] aggregate pricing." Doc. 228 at ¶ 47; Doc. 165-5 at ¶¶ 219, 222. The complaint further alleged that the BlueCard program made Blue Plans more attractive to "employers who have national or multi-state business or whose employees require healthcare services while they are out of state," and allowed Blue Plans to "compete more effectively in their local markets, which in turn strengthens the Blue Cross Blue Shield brand and accordingly strengthens the ability of the Blue Plans to collectively compete with national competitors." Doc. 228 at ¶ 47;

4

Doc. 165-5 at ¶¶ 19, 27, 166, 168, 267.  As a result, the complaint alleged, the Blue Plans "collectively insure[d] over 100 million patients, or about one in three Americans.  Because this [wa]s such a large pool of patients, the[] [Blue Plans] [we]re able to perpetuate th[e] scheme through their combined economic power and market dominance," including by "coerc[ing] [physicians], at the risk of being denied patient referrals and/or 'black-listed' altogether, into providing care under Defendants' policies."  Doc. 228 at ¶ 47; Doc. 165-5 at ¶¶ 28, 136.

Neither the fifth amended complaint nor the sixth amended complaint in *Love* brought antitrust claims.  Doc. 228 at ¶ 47.

**B.  The MDL Action**

In 2012, several antitrust class actions were filed against the Association, HCSC, and several other Blue Plans.  *Id*. at ¶ 25.  The Judicial Panel on Multidistrict Litigation consolidated many of the suits in the Northern District of Alabama, creating the *In re Blue Cross Blue Shield Antitrust Litigation* MDL ("MDL Action").  Doc. 216 at ¶ 5; Doc. 228 at ¶ 25.  The consolidated suits were divided into a Subscriber Track and a Provider Track.  Doc. 216 at ¶ 7; Doc. 228 at ¶ 26.  The Subscriber Track Plaintiffs are "individuals or entities that are covered under a health insurance plan issued by a Blue Plan," and the Provider Track Plaintiffs are "health care providers who render services to the Blue Plans' subscribers."  Doc. 228 at ¶¶ 27-28.  The Subscriber and Provider Tracks have separate consolidated complaints; the operative complaint in each is the fourth amended complaint.  Doc. 216 at ¶ 4; Doc. 228 at ¶ 29.

Both the Subscriber and Provider complaints allege that the Blue Plans, in collaboration with the Association, conspired to restrain competition among themselves, in violation of federal antitrust law.  Doc. 216 at ¶ 4; Doc. 228 at ¶ 30.  Specifically, the complaints allege that the Blue Plans entered into licensing agreements in which each Blue Plan agreed not to compete with other Blue Plans outside of their exclusive service areas ("ESA").  Doc. 228 at ¶¶ 31, 33.  The

5

Provider complaint further alleges that the Blue Plans fix the prices they pay to providers and boycott providers outside their ESAs. *Id*. at ¶ 35. According to the Provider complaint, the decreased competition resulting from the Blue Plans' ESA, price fixing, and boycotting conspiracies allows them to "leverage … their collective market power to impose deep discounts on reimbursements to providers," resulting in reduced compensation for providers. Doc. 216 at ¶ 4; Doc. 191-5 at ¶¶ 7-8, 12-13, 15-18, 215, 388. The Provider complaint further alleges that the price-fixing and boycott conspiracy is enabled by each Blue Plan's participation in the BlueCard program, which "lock[s] in the fixed, discounted reimbursement rates that each [Blue Plan] achieves through market dominance in its Service Area[,] and makes those subcompetitive rates available to all other Blue[] [Plans] without the need for negotiation or contracting" by allowing subscribers of one Blue Plan to receive healthcare services "within the Service Area of another [Blue Plan]" at the host plan's discounted rates. Doc. 228 at ¶¶ 36-37. The Subscriber complaint alleges that the Blue Plans' ESA conspiracy—that is, their agreement to "allocate markets"—results in higher healthcare premium costs for subscribers. Doc. 216 at ¶ 4; Doc. 191-6 at ¶¶ 3, 9-12.

The Provider and Subscriber complaints are "related claims" under the Related Claims provisions of HCSC's Homeland policy and its policy (of which more in a moment) with a different insurer, Allied World Surplus Lines Insurance Company. Doc. 216 at ¶ 9. HCSC reported to Allied World as a single claim all actions consolidated in the MDL and paid Allied World a single retention fee for those actions, and Allied World agreed to treat all of those actions as a single claim. *Id*. at ¶¶ 9, 12.

C.    **The *Musselman* Litigation**

In 2013, in *Musselman v. Blue Cross Blue Shield of Alabama*, 1:13-cv-20050-FAM (S.D. Fla.), healthcare providers who had settled with HCSC in *Love* sued several Blue Plans,

including HCSC, seeking a declaration that they could participate in the MDL's Provider Track despite being "releasing parties" in the *Love* settlement. *Id*. at ¶ 13; Doc. 227 at ¶ 6. The *Love* settlement included a release of "any and all causes of action … that are, were, or could have been asserted against any of the [defendants] by reason of, arising out of, or in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, business practices, representations, omissions, circumstances, or other matters referenced in the [*Love*] Action," and it prohibited the releasing parties from pursuing any such actions. Doc. 227 at ¶ 4.

The Blue Plans, including HCSC, moved to dismiss *Musselman* on the ground that the antitrust claims asserted in the MDL Action were "released claims" within the meaning of the *Love* settlement. Doc. 216 at ¶ 18. In support, the Blue Plans argued that "*Love* involved essentially the same facts, conspiracy, allegations, and harm that are at issue in [the MDL Provider complaint]." *Id*. at ¶ 23. The Blue Plans explained that, "like [the Provider complaint], *Love* alleged that Defendants and other Blue plans had conspired for years to undercompensate physicians for their services," that their "conspiracy was carried out through the [Association]," and that "Defendants had large market shares and used their market dominance to force Physicians to provide care based on Defendants' terms and conditions, resulting in Physicians receiving lower reimbursement and less favorable terms than they otherwise would have." *Id*. at ¶¶ 24, 26-27; Doc. 165-11 at 12. In so arguing, the defendants cited both the fifth amended and sixth amended complaints in *Love*. Doc. 165-11 at 11-15. The district court dismissed the suit, holding that the providers were precluded from joining the MDL Action because the Provider complaint's claims "arise[] out of and relate[] to the 'facts, acts, events … or other matter' in *Love*," as "both complaints are based on allegations that Defendants, acting through [the

Association], conspired to reduce provider reimbursement." *Musselman v. Blue Cross Blue Shield of Ala.*, 2013 WL 4496509, at *5 (S.D. Fla. Aug. 20, 2013); *see* Doc. 216 at ¶¶ 35-37.

Defending the judgment on appeal, the Blue Plans, including HCSC, argued that the MDL Provider complaint asserted claims involving "numerous allegations" made in *Love* relating to "geographic limitations," "coercive use of market power," the Association, and the BlueCard program. Doc. 165-12 at 51-55; Doc. 216 at ¶¶ 27, 39. For instance, the Blue Plans argued that "*Love*'s allegations about market power and geographic limitations lie at the very heart of the [Provider] complaint, which alleges that an antitrust conspiracy among the Blue Plans has 'perpetuated and strengthened the dominant market position each BCBS plan enjoys in its specifically defined geographic market," and submitted that "[the Provider complaint] likewise recycles *Love*'s allegations about the Blue Plans' abuses of market power, claiming that Blue Plans have used their market power to force healthcare providers to accept anticompetitive rates and terms, with the result that healthcare providers have received lower reimbursement rates and less favorable contract terms than they would have received without the alleged conspiracy." Doc. 216 at ¶¶ 30-31. In addition, the Blue Plans argued that the conspiracy alleged in the Provider complaint "involves the same mechanisms as the conspiracy alleged in *Love*," observing that both conspiracies were alleged to have been "implemented through [the Association]" and that the BlueCard program was alleged to play an "integral part" in both. *Id.* at ¶ 27; Doc. 165-12 at 54-55. As they had done in the district court, the Blue Plans on appeal cited in support both the fifth amended and sixth amended complaints in *Love*. Doc. 165-12 at 51-58 & n.16. The Eleventh Circuit affirmed. *Musselman v. Blue Cross & Blue Shield of Ala.*, 684 F. App'x 824 (11th Cir. 2017).

### D.     HCSC's Insurance Policies

HCSC holds three insurance policies, relevant to this coverage litigation, for the policy period January 1, 2012 through January 1, 2013: a primary Managed Care Errors & Omissions ("E&O") Liability Insurance Policy issued by Allied World; a first-layer excess E&O policy issued by Travelers Excess and Surplus Lines Company; and a second-layer excess E&O policy issued by Homeland. Doc. 216 at ¶ 55; Doc. 228 at ¶¶ 5, 8, 19-20. The Homeland policy is a "follow form excess policy," meaning that it incorporates, with certain exceptions, the Allied World and Travelers policies' terms and conditions. Doc. 216 at ¶ 56; Doc. 228 at ¶ 5. One key exception is that the Homeland policy does not follow form to the underlying policies "with respect to any provisions to the contrary contained in [the Homeland] Policy." Doc. 283 at ¶ 14; Doc. 191-2 at 12-13, § I.D.2.

None of the policies are "duty to defend" policies; rather, under all three, HCSC must defend itself against claims, and the insurer promises only to pay for any resulting "[i]nsured [l]oss which [HCSC] is legally obligated to pay." Doc. 251 at ¶¶ 10, 12, 15-16. The Allied World policy has a retention fee of $10 million and provides $20 million in coverage; the Travelers policy provides another $20 million in coverage; and the Homeland policy provides a further $20 million in coverage. Doc. 216 at ¶ 54; Doc. 228 at ¶¶ 6, 8-9. Additional pertinent policy terms are set forth in the Discussion section below.

### E.     *Allied World* Litigation and Settlement

In 2017, Allied World filed *Allied World Surplus Lines Insurance Co. v. Health Care Service Corporation*, 17 C 2480 (N.D. Ill.), seeking a declaration that its policy provided no coverage to HCSC in the MDL Action. Doc. 243 at ¶ 7. In April 2018, HCSC and Allied World attended a mediation session along with Homeland, which was not a party to that suit. *Id*. at ¶ 9. Homeland was excluded from subsequent settlement negotiations. *Ibid*. HCSC eventually

entered into a settlement agreement with Allied World and Travelers. *Id.* at ¶ 11. HCSC refuses to provide the settlement agreement to Homeland, whether in discovery in the present suit or otherwise. *Id.* at ¶¶ 12-13, 57.

### F.     MDL Litigation Defense Updates

Since 2017, Homeland has elected to "associate" in HCSC's defense of the MDL Action, as its policy entitles it to do. *Id.* at ¶¶ 15-16. Between February 2014 and September 2020, Homeland sent HCSC numerous letters requesting information about the MDL Action, including defense costs and expenses, a "liability and damages analysis," an allocation of any proposed settlement among the Blue Plans and the Association, summaries of depositions, and a "Litigation Plan." *Id.* at ¶¶ 20-25. HCSC has not provided Homeland with deposition summaries, full copies of its defense invoices, or an evaluation of its *individual* potential liability and exposure—as opposed to the joint potential liability and exposure of *all* Blue Plans—in the MDL Action. *Id.* at ¶¶ 29, 31, 33-34. HCSC has, however, provided Homeland with litigation updates; access to mediation sessions, submissions, and term sheets; deposition transcripts, expert reports, briefs, written discovery materials, and court presentations; and defense expense totals and estimates. Doc. 262 at ¶¶ 16-19, 30, 32, 34-37, 41, 43-44, 49, 51. Almost all the information HCSC has provided Homeland is subject either to confidentiality agreements that allow only Homeland's outside counsel to view it or to the mediation privilege. *Id.* at ¶¶ 21-23, 45-46; Doc. 243 at ¶¶ 38-39.

### G.     Homeland's Agreement to Not Raise "Lack of Consent" Defense to Proposed MDL Subscriber Settlement

In November 2020, the MDL court granted preliminary approval to a settlement in the Subscriber Track (the "Subscriber Settlement"). Doc. 251 at ¶ 28. Under its policy, Homeland has no coverage obligation "with respect to any Claim that is settled without [its] written

consent." Doc. 191-2 at 12, § I.D.1.  Before making settlement offers or agreeing to the Subscriber Settlement, HCSC sought Homeland's agreement that it would not later raise its lack of consent to settle as a reason for denying coverage for the settlement.  Doc. 262 at ¶ 3.  The requested waivers of Homeland's "lack of consent" defense were "subject to a full reservation of all of Homeland's other rights and coverage defenses, including the right to challenge the reasonableness of settlement." *Ibid*.

Before agreeing to the waivers, Homeland asked HCSC for information evaluating its individual liability and exposure in the MDL Action.  Doc. 243 at ¶ 44.  Homeland explained that it would "not be able to evaluate and intelligently respond to any request for funding of th[e] Settlement until [HCSC] provide[d] [Homeland] with the requested information." *Id*. at ¶ 45. HCSC refused to provide that information, which it maintained was privileged and unnecessary to enable Homeland to decide whether to waive its "lack of consent" defense, and Homeland reluctantly agreed to the waivers even "[w]ithout [being granted] access to the information necessary to formulate a complete coverage determination." *Id*. at ¶¶ 37, 44, 46.

Thomas Newman, an expert retained by Homeland, explained at his deposition that an insurer's waiver of its "lack of consent" defense solves a problem arising when there is "an opportunity for the policyholder to settle at a particular time and the policyholder wants to settle but the insurance carrier doesn't yet have enough information to make an informed decision on whether to consent to the settlement."  Doc. 262 at ¶ 8.  "[I]f the insurer refuses to settle or consent to the settlement … it could be found to have acted in bad faith." *Ibid*.  In order to "preserve the insurer's rights in that scenario with respect to challenging the reasonableness of the settlement or [] raising other coverage issues but still allowing the policyholder to settle without violating the consent to settle clause," the policyholder can "[o]btain a waiver of the

consent to settlement clause allowing the insurer to raise any coverage defenses or arguments about the unreasonableness of the settlement after you get rid of the Plaintiffs." *Ibid*. In other words, "the insurance carrier agrees not to raise lack of consent as a coverage defense later on … [w]hile still preserving all other rights under the policy." *Ibid*. Newman testified that there are "advantages to both the insurance carriers and the policyholders in this kind of arrangement," as it allows the policyholder to settle the case and eliminates the risk of a bad faith claim against the insurer, and the insurer "doesn't waive any other coverage defense or its right to challenge the reasonableness of the settlement." *Id*. at ¶ 9.

Linda Unger—Claims Counsel and Assistant Vice President at OneBeacon Insurance Group, of which Homeland is an indirect, wholly-owned subsidiary, Doc. 251 at ¶¶ 46, 61— testified that Homeland has agreed to waive its "lack of consent" defense in other cases where it "ha[d] not been given sufficient information to make th[e] determination as to the reasonableness of the settlement," explaining that "we don't want to prevent our insured from reaching a settlement that is favorable to it, and, therefore, we have agreed to waive that particular defense." Doc. 262 at ¶¶ 10-11. Similarly, Virginia Troy—Vice President for Managed Care Claims at OneBeacon, Doc. 251 at ¶ 57— testified that Homeland has agreed to waive its "lack of consent" defense in other cases where "the insured presents some need for immediacy in its settlement and [Homeland] has not been provided with complete information." Doc. 262 at ¶ 12.

HCSC has not asked Homeland to fund the Subscriber Settlement, to pay for any defense expenses in the MDL Action, or for a determination of whether there is coverage for the Subscriber Settlement under the Homeland policy. *Id*. at ¶¶ 5-7. Indeed, HCSC has not asked for any payment under the Homeland policy for the MDL Action. Doc. 283 at ¶ 17. Unger testified that "part of the reason [Homeland] brought this lawsuit" was because it "expect[ed] at

some point in time we will be told that a settlement has been reached in principal and our insured, HCSC, will come to us and request payment. We currently do not have sufficient information to evaluate the reasonableness of any such settlement. And part of the reason we brought this lawsuit is to be able to get that information in advance of such an eventuality." Doc. 243 at ¶ 52.

The Subscriber Settlement is currently pending final approval by the MDL court. *Id*. at ¶ 6.

## Discussion

As noted, Homeland seeks a declaratory judgment that its policy does not provide coverage for HCSC in the MDL Action in light of: (a) the Related Claims provision and Prior and Pending exclusion, because the MDL Action is related to claims for which HCSC sought coverage in a prior policy period, Doc. 59 at ¶¶ 72-77; (b) the Cooperation provision, because HCSC has refused to cooperate with Homeland's coverage investigation, *id*. at ¶¶ 78-89; and (c) the Exhaustion provision, because HCSC cannot establish that it properly exhausted its coverage under the Allied World and Travelers policies, *id*. at ¶¶ 6, 97-99. The parties agree that Illinois law governs their dispute. Doc. 164-1 at 9; Doc. 203 at 16-17.

Under Illinois law, an insurance policy, like any contract, "is to be construed as a whole, giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose." *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 314 (Ill. 2006). "[The court's] primary function is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Founders Ins. Co. v. Munoz*, 930 N.E.2d 999, 1003 (Ill. 2010). "Although policy terms that limit an insurer's liability will be liberally construed in favor of coverage, this rule of construction only comes into play when the policy is

13

ambiguous." *Rich v. Principal Life Ins. Co.*, 875 N.E.2d 1082, 1090 (Ill. 2007) (quoting *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005)). "While [the court] will not strain to find an ambiguity where none exists, neither will [it] adopt an interpretation which rests on gossamer distinctions that the average person, for whom the policy is written, cannot be expected to understand." *Munoz*, 930 N.E.2d at 1004 (internal quotation marks and citation omitted).

## I.       Related Claims Provision and Prior and Pending Exclusion

### A.       Related Claims Provision

The Homeland policy incorporates this Related Claims provision from the Allied World policy:

> **Related Claims Deemed Single Claim; Date Claim Made**: All Related Claims, whenever made, shall be deemed to be a single Claim and shall be deemed to have been first made on the earliest of the following dates:
>
> (1) the date on which the earliest Claim within such Related Claims was received by an Insured; or
>
> (2) the date on which written notice was first given to the Underwriter of a Wrongful Act which subsequently gave rise to any of the Related Claims, regardless of the number and identity of claimants, the number and identity of Insureds involved, or the number and timing of the Related Claims, even if the Related Claims comprising such single Claim were made in more than one Policy Period.

Doc. 216 at ¶ 57; Doc. 228 at ¶ 17; Doc. 191 at 61, § III.C.  The Allied World policy defines "Related Claims" as:

> [A]ll Claims for Wrongful Acts based on, arising out of, resulting from, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances[,] situations, transactions or events, whether related logically, causally or in any other way.

Doc. 216 at ¶ 58; Doc. 228 at ¶ 16; Doc. 191 at 68, § IV.Q.

### 1. Provider Track

Homeland argues that the Related Claims provision precludes coverage for the MDL Provider Track because it is a "related claim" to the *Love* litigation, which was "brought years before the 2012 Homeland Policy was issued." Doc. 164-1 at 4. HCSC does not dispute that the Related Claims provision precludes coverage if the Provider Track is "related" to the *Love* litigation, but it contends that the two are not related. Doc. 203 at 17-36.

The Allied World policy's definition of "related claims" encompasses not only claims that are "based on," "aris[e] out of," or "result[] from" the "same or related" facts, but also claims that "*in any way involv[e]*" facts that are "related logically, causally or *in any other way*." Doc. 228 at ¶ 16 (emphasis added). That definition of "related claims" is "very broad." *Gregory v. Home Ins. Co.*, 876 F.2d 602, 606 (7th Cir. 1989) ("[T]he common understanding of the word 'related' covers a very broad range of connections."); *see also USA Gymnastics v. Liberty Ins. Underwriters, Inc.,* 27 F.4th 499, 522 (7th Cir. 2022) ("The plain meaning of 'based upon, arising from, or in any way related to' includes nearly any type of connection between the claim and the insured's wrongful acts. That includes a wide array of logical connections."); *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 391 (7th Cir. 2008) (holding that a release of claims "based on, arising out of, or in *any way related to*" claims brought in a prior action "is broad," and noting that "'related' has a common understanding and meaning and 'covers a very broad range of connections'") (quoting *Gregory*, 876 F.2d at 606); *Twin City Fire Ins. Co. v. Vonachen Servs., Inc.*, 2021 WL 4876943, at *16 (C.D. Ill. Oct. 19, 2021) ("The [] language 'in any way related to any actual or alleged' is incredibly broad, suggesting only a minimal connection is necessary.") (citing *R & B Kapital Dev., LLC v. N. Shore Cmty. Bank & Tr. Co.*, 832 N.E.2d 246, 252 (Ill. App. 2005)); *Hanover Ins. Co. v. R.W. Dunteman Co.*, 446 F. Supp. 3d 336, 346 (N.D.

Ill. 2020) ("The plain language of these [] provisions is expansive, and these definitions sweep broadly. The Policies' use of the word 'any' in defining … Related Claims confirms that only a minimal connection is required.").

Under the policy's broad definition of "related claims," the MDL Provider Track and the *Love* litigation are related. The fifth amended complaint in *Love*—the operative complaint when HCSC settled the claims against it—and the Provider Track complaint both allege that the Blue Plans conspired, in collaboration with and facilitated by the Association, to leverage their "overwhelming economic power and market dominance" to force physicians to accept below-market reimbursement rates. Doc. 165-10 at ¶ 282; Doc. 216 at ¶ 4; Doc. 228 at ¶¶ 30-35, 47. Moreover, the sixth amended complaint in *Love*—which clarified the allegations against HCSC and other Blue Plans, and, as noted, on which HCSC relied in *Musselman* in arguing that the *Love* plaintiffs should be barred from participating in the MDL Action—alleges that the Blue Plans' market dominance resulted from the fact that they were "not competitors," but rather "operate[d] in distinct geographical regions," and that all participated in the BlueCard program, which was key to implementing the conspiracy to underpay providers. Doc. 165-5 at ¶ 164; Doc. 228 at ¶ 47. Along much the same lines, the Provider Track complaint alleges that the Blue Plans are able to impose below-market reimbursement rates because of their agreements not to compete within defined geographic markets, and further alleges that the conspiracy is enabled in large part by the BlueCard program. Doc. 216 at ¶ 4; Doc. 228 at ¶¶ 36-37. Given the substantial overlap between the "facts, circumstances, [and] situations" grounding the claims in the *Love* and Provider Track complaints, Doc. 228 at ¶ 16, the Provider Track and the *Love* litigation are related within the meaning of the Related Claims provision. *See Freeburg Cmty. Consol. Sch. Dist. No. 70 v. Country Mut. Ins. Co.*, 183 N.E.3d 1020, 1046 (Ill. App. 2021)

(holding that four sexual assault allegations involving "the same, continuing course of misconduct by the same school officials that culminates in the same type of harm" were related under a policy's related claims provision); *Cont'l Cas. Co. v. Howard Hoffman & Assocs*., 955 N.E.2d 151, 165-70 (Ill. App. 2011) (same holding for negligent supervision allegations in three separate suits brought by different clients, where the alleged negligence concerned a supervisee's embezzlement from multiple client accounts using the same methods); *Vita Food Prod., Inc. v. Navigators Ins. Co*., 2017 WL 2404981, at *6 (N.D. Ill. June 2, 2017) (same holding for a lawsuit and a prior demand letter, where both alleged that the same transaction breached the defendant's fiduciary duties).

HCSC argues that interpreting the Related Claims provision to reach this result improperly renders superfluous the provision in the Homeland policy providing coverage for "claims for Antitrust Activity," which includes "any actual or alleged: price fixing; restraint of trade; monopolization; unfair trade practices; or violation of the Federal Trade Commission Act, the Sherman Act, the Clayton Act, or any other federal statute involving antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities … ." Doc. 191 at 2, 66, § IV.D.A; Doc. 203 at 25-26; Doc. 228 at ¶¶ 15, 24. According to HCSC, if the Provider Track is "related" to *Love*, then all claims "containing allegations of collusion" would be related to *Love*, thereby "negat[ing] virtually all of the specific express coverage provided" by the "Antitrust Activity" coverage. Doc. 203 at 26. That logic does not hold. The Provider Track is related to *Love* not because it rests on allegations of collusion, but because the same core set of facts and circumstances ground each complaint. There is thus no basis to conclude that any action against HCSC alleging collusion would be related to *Love*, which means that the Antitrust Activity coverage is not "negate[d]" by finding that the Provider Track is related to *Love*. For

example, the fact that the Provider Track is related to *Love* would not preclude Antitrust Activity coverage for allegations that HCSC colluded to fix prices with insurers—such as Aetna, Cigna, or Humana—that compete with Blue Plans.

HCSC also contends that the Related Claims provision is "ambiguous and thus, must be construed in favor of coverage for HCSC." *Id.* at 27. But for the reasons discussed above, *Love* and the Provider Track *are* related under the Related Claims provision's plain terms, so any argument resting on the provision's supposed ambiguity fails. *See Gregory*, 876 F.2d at 606 ("[W]e don't think the rule requiring insurance policies to be construed against the party who chose the language requires such a drastic restriction of the natural scope of the definition of the word 'related.' Parties are generally free to include language of their choice in contracts, and courts should refrain from rewriting them.").

Although the analysis could stop here, the court's holding that *Love* and the MDL Provider Track are related under the Related Claims provision is confirmed by HCSC's representations and arguments in *Musselman*. "Judicial estoppel precludes parties from abandoning positions taken in earlier litigation. The principle is that if you prevail in Suit #1 by representing that A is true, you are stuck with A in all later litigation growing out of the same events." *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1547 (7th Cir. 1990) (internal quotation marks and citation omitted); *see also In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position.") (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)). Judicial estoppel "may be applied only where a clearly inconsistent position is taken" and where "the party to be estopped [] convinced the court to accept its position in the earlier litigation."

*Cassidy*, 892 F.2d at 641; *see also Cannon-Stokes v. Potter*, 453 F.3d 446, 447 (7th Cir. 2006) (holding that the "requirements of judicial estoppel" are satisfied when a party makes a representation that prevails, resulting in a valuable benefit, and "wants to assert the opposite in order to win a second time").

Judicial estoppel applies here. In moving to dismiss *Musselman*, HCSC argued in the district court that "*Love* involved essentially the same facts, conspiracy, allegations, and harm that are at issue in [the Provider Track]," specifically noting that, "like [the Provider Track complaint], *Love* alleged that Defendants and other Blue plans had conspired for years to undercompensate physicians for their services," that the "conspiracy was carried out through the [Association]," and that "Defendants had large market shares and used their market dominance to force Physicians to provide care based on Defendants' terms and conditions, resulting in Physicians receiving lower reimbursement and less favorable terms than they otherwise would have." Doc. 216 at ¶¶ 23-24, 26-27; Doc. 165-11 at 12. HCSC's arguments prevailed: the district court granted its motion to dismiss, reasoning that "the claims asserted in [the Provider Track complaint] arise[] out of and relate[] to the 'facts, acts, events … or other matter' in *Love*," as "both complaints are based on allegations that Defendants, acting through [the Association], conspired to reduce provider reimbursement." *Musselman*, 2013 WL 4496509, at *5. HCSC obtained a "valuable benefit" from that ruling, successfully barring the *Musselman* plaintiffs from suing it in the MDL Action for antitrust violations. *Ibid.* And now, in the present suit, HCSC "assert[s] the opposite" of the position it successfully advanced in *Musselman*: that "*Love* and the [MDL Action] are fundamentally different cases that concern very different alleged wrongful conduct" and that share only a "handful of common allegations." Doc. 203 at 23-24. HCSC's argument here is "clearly inconsistent" with its argument in *Musselman* that "*Love*

19

involved essentially the same facts, conspiracy, allegations, and harm that are at issue in [the Provider Track complaint]."  Doc. 216 at ¶ 23.

Likewise, on appeal in *Musselman*, HCSC argued to the Eleventh Circuit that "*Love*'s allegations about market power and geographic limitations lie at the very heart of the [Provider] complaint," and that the conspiracy alleged in the Provider complaint "involves the same mechanisms as the conspiracy alleged in *Love*."  Doc. 216 at ¶ 30; Doc. 165-12 at 54-55.  That argument prevailed—the Eleventh Circuit affirmed the district court's judgment—and it directly contradicts HCSC's position here that "[t]he central allegations in *Love* and the Antitrust Litigation [MDL Action] are … factual[ly] distinct wrongful conduct."  Doc. 203 at 24.

HCSC is therefore "prohibit[ed] … from asserting" that *Love* and the Provider Track do not allege "essentially the same facts, conspiracy, allegations, and harm."  *Cassidy*, 892 F.2d at 642; Doc. 216 at ¶ 23.  And given the broad definition of "related claims" in the policy to mean "all [c]laims … based on, arising out of, resulting from, or in any way involving the same or related facts, circumstances, situations, transactions or events … , whether related logically, causally or in any other way," Doc. 216 at ¶ 58; Doc. 191 at 68, § IV.Q, there is no question that claims for two actions asserting "essentially the same facts, conspiracy, allegations, and harm" are related.  *See Freeburg*, 183 N.E.3d at 1046; *Howard Hoffman*, 955 N.E.2d at 165-70; *Vita Food Prod.*, 2017 WL 2404981, at *6.  Judicial estoppel thus provides an independent reason for granting Homeland summary judgment on the Related Claims provision as to the Provider Track.

### 2.    Subscriber Track

The same result does not hold for the Subscriber Track.  Homeland argues that, because the Subscriber Track is related (under the Related Claims provision) to the Provider Track, and the Provider Track is related (under the Related Claims provision) to the *Love* litigation, the

Subscriber Track is related to the *Love* litigation. Doc. 164-1 at 14-17. Homeland's logic is faulty. That the Subscriber and Provider Tracks are related under the Related Claims provision does not necessarily mean that the Subscriber Track and *Love* are related. *See Atl. Specialty Ins. Co. v. Indep. Blue Cross, LLC*, 2021 WL 3784242, at *5 n.3 (E.D. Pa. Aug. 26, 2021) ("Whether both tracks of the Antitrust Litigation are related to one another is not dispositive as to whether both tracks must relate to the *Love* litigation.").

Homeland offers no evidence regarding the relationship of the Subscriber Track to *Love*, and it is clear from the record that they are not related. As noted, the *Love* suit alleged a conspiracy among the Blue Plans and the Association to leverage their market dominance to *underpay providers*. Doc. 228 at ¶¶ 41-45. By contrast, the Subscriber Track complaint alleges a conspiracy among the Blue Plans and the Association not to compete within defined geographic areas, resulting in *higher healthcare premium costs for subscribers*. Doc. 216 at ¶ 4; Doc. 191-6 at ¶¶ 3, 9-12; Doc. 228 at ¶¶ 31, 33. Because *Love* and the Subscriber Track allege conspiracies with different goals, mechanisms, and effects, they are not "based on, arising out of, resulting from, or in any way involving the same or related facts." Doc. 228 at ¶ 16; *see Cont'l Cas. Co. v. Grossmann*, 648 N.E.2d 175, 178 (Ill. App. 1995) (holding that three legal malpractice allegations were not related because they "involv[ed] different transactions, different persons, and different bank accounts," and were "related only in the coincidence that all of the acts in some way relate to various investments in or by the Springdale Corporation").

Accordingly, while Homeland is entitled to summary judgment on the question whether the Related Claims provision precludes coverage for HCSC in the Provider Track, HCSC is entitled to summary judgment on the question whether the Related Claims provision precludes coverage for it in the Subscriber Track.

### B.     Prior and Pending Exclusion

Homeland claims that the Prior and Pending exclusion precludes coverage for HCSC in the MDL Action.  Doc. 59 at ¶¶ 75-77.  HCSC seeks summary judgment on that claim. Doc. 203.  The court need not address whether the exclusion precludes coverage for the Provider Track, as coverage is already precluded by the Related Claims provision.  The court accordingly discusses only the Subscriber Track.

As with the Related Claims provision, the Homeland policy incorporates the Allied World policy's Prior and Pending exclusion, which states in pertinent part:

> The Underwriter shall not pay any Loss, including Defense Expenses, for any Claim:
>
> * * *
>
> (8) based upon, arising out of, resulting from, or in any way involving any fact, circumstance, situation, transaction, event, Wrongful Act or series of facts, circumstances, situations, transactions, events or Wrongful Acts:
>
> (a) underlying or alleged in any litigation or administrative or regulatory proceeding brought prior to and/or pending as of the Inception Date stated in ITEM 2(a) of the Declarations: (i) to which any Insured was a party; or (ii) with respect to which any Insured, as of the Inception Date, knew that an Insured would be made a party thereto;
>
> (b) which was the subject of any notice given prior to the Inception Date under any other policy of insurance or plan or program of self-insurance; or
>
> (c) which was the subject of any Claim made prior to the Inception Date[.]

Doc. 228 at ¶¶ 18, 24; Doc. 191 at 59, § II.C.8.  HCSC submits that its arguments as to why the Related Claims provision does not preclude coverage—that the Subscriber Track is not related to the *Love* litigation—apply with equal force to the Prior and Pending exclusion, as both provisions use essentially the same language and mechanism to preclude coverage for related claims.  Doc. 203 at 7.  In opposing summary judgment, Homeland argues that there are two "material issues of fact about [the Prior and Pending exclusion's] application on this record":

first, whether the Subscriber Track relates to any litigation other than *Love*; and second, the policy's "Inception Date." Doc. 224 at 24-25.

"A party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion," *Burton v. Kohn L. Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (internal quotation marks omitted), and "[a] party must present more than mere speculation or conjecture to defeat a summary judgment motion," *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 585 (7th Cir. 2021) (internal quotation marks omitted). The non-moving party "may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; [rather, it] must go beyond the pleadings and support [its] contentions with proper documentary evidence." *Weaver v. Champion Petfoods USA Inc*., 3 F.4th 927, 934 (7th Cir. 2021) (internal quotation marks omitted).

HCSC presents strong evidence that the Subscriber Track is not related to the *Love* litigation, as discussed above in the Related Claims analysis. And Homeland does not dispute that, under the plain terms of the Prior and Pending exclusion, if the Subscriber Track is not related to a prior claim, coverage for the Subscriber Track is not precluded by the exclusion. Homeland submits only that, in its complaint and in questions it asked at depositions, it raised the "possible relation of an array of claims to the MDL Action." Doc. 224 at 24. But Homeland does not adduce any evidence or provide any detail as to *how* the MDL Action is related to that "array" of other claims. *Ibid*. Homeland's vague and speculative assertions, unsupported by "definite, competent evidence," cannot forestall summary judgment. *Burton*, 934 F.3d at 579.

Homeland also argues that there is a material dispute concerning "what coverage was issued [and] in what policy years that coverage was issued, and the policy years in which the claim may have arisen." Doc. 224 at 25. But it is undisputed that both the Allied World and

Homeland policies were "issued to HCSC for the policy period of January 1, 2012 to January 1, 2013," Doc. 228 at ¶¶ 5, 8, and Homeland does not offer any reason to conclude that there is a dispute concerning the reference to the Inception Date in the Prior and Pending exclusion.

Accordingly, HCSC is entitled to summary judgment on the question whether the Prior and Pending exclusion bars coverage for the Subscriber Track, but not on whether the exclusion bars coverage for the Provider Track.

## II.     Cooperation Provision

Homeland also claims that coverage is barred because HCSC has not satisfied the Homeland policy's Cooperation provision. Doc. 59 at ¶¶ 78-89; Doc. 168-1 at 4. HCSC responds that it has not breached its cooperation obligations and that, even if it had, coverage is not barred because Homeland has not suffered "substantial prejudice" from any lack of cooperation. Doc. 193 at 5; Doc. 239 at 7. There is no need to decide whether HCSC breached its cooperation obligations because, even if it did, Homeland has not suffered any prejudice. *See Wilton v. Seven Falls Co*., 515 U.S. 277, 288 (1995) ("By the Declaratory Judgment Act, Congress … created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants. Consistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment [in light of] considerations of practicality and wise judicial administration.").

As noted, the Homeland policy is not a "duty to defend" policy; rather, HCSC defends itself against covered claims, and Homeland is obligated to pay for any resulting "[i]nsured [l]oss[es] which [HCSC] is legally obligated to pay." Doc. 251 at ¶¶ 10, 12, 15-16. Still, the Homeland policy's Cooperation provision provides that Homeland

> may, at its sole discretion, elect to associate in the investigation, settlement or
> defense of any Claim against [HCSC], even if the Underlying Insurance has
> not been exhausted. If [Homeland] so elects, [HCSC] will cooperate with

24

> [Homeland] and will make available all such information and records as
> [Homeland] may reasonably require.

Doc. 243 at ¶ 15; Doc. 191-2 at 15, § VI.  Homeland elected in 2017 to associate in the

investigation and defense of the MDL Action.  Doc. 267 at ¶ 3.

"[W]here the insured breaches the duty to cooperate, the insurer is relieved of liability

only if the breach results in substantial prejudice to the insurer."  *Cas. Indem. Exch. v. Vill. of

Crete*, 731 F.2d 457, 460 (7th Cir. 1984) (citing *M.F.A. Mut. Ins. Co. v. Cheek*, 363 N.E.2d 809,

813 (Ill. 1977)); *see also Country Mut. Ins. Co. v. Livorsi Marine, Inc.*, 856 N.E.2d 338, 348

(Ill. 2006) ("[U]nless a breach of the cooperation clause substantially prejudices the insurer, the

insurer cannot rely on the breach to escape its obligations under the policy.").  "Proof of

substantial prejudice requires an insurer to demonstrate that it was actually hampered … by the

violation of the cooperation clause," and there is no "presumption of prejudice when the insurer

attempts to avoid responsibility for a breach of the cooperation clause."  *Cheek*, 363 N.E.2d at

813.

Homeland admits that any prejudice it suffered is "not related to its defense of the

underlying [MDL] action."  Doc. 248 at 8.  Rather, Homeland submits it was prejudiced by

"HCSC's refusal to provide important information such as the settlement agreement [with Allied

World and Travelers], [an] analysis of HCSC's exposure, and defense invoices" because "it

cannot evaluate, for example, exhaustion or HCSC's individual liability *necessary for its

coverage investigation*."  *Id*. at 8-9 (emphasis added).  HCSC responds that prejudice pertinent to

the cooperation inquiry must relate to Homeland's ability to "associate in the investigation,

settlement or defense" of the MDL Action, not to Homeland's ability to make a coverage

determination.  Doc. 193 at 11-13.  HCSC is correct.

Under Illinois law, the prejudice necessary to relieve an insurer of its coverage obligations under a cooperation provision relates to the insured's breach of its contractual cooperation obligations. *See Emps. Ins. of Wausau v. James McHugh Const. Co.*, 144 F.3d 1097, 1105 (7th Cir. 1998) (holding that, to determine the "purpose" of "[a]ny condition in the policy requiring cooperation on the part of the insured," the court looks to "the language of the … policy"). As noted, the Cooperation provision states that HCSC must "cooperate with [Homeland] and [] make available all such information and records as [Homeland] may reasonably require" if Homeland "elect[s] to associate in the investigation, settlement or defense of any Claim against [HCSC]." Doc. 243 at ¶ 15; Doc. 191-2 at 15, § VI. By its plain terms, the provision protects Homeland's right to be informed and to participate, to some extent, in the "investigation, settlement or defense" of litigation against HCSC. The provision does not grant Homeland the right to investigate whether its policy covers HCSC's expenses in the underlying litigation. Because Homeland argues that HCSC's refusal to provide it with certain information prejudiced only its "investigation into coverage" and was "not related to its defense of the underlying action," Doc. 248 at 8, Homeland has not adduced proof of the substantial prejudice sufficient to defeat its coverage obligations under the Cooperation provision. *See Phila. Indem. Ins. Co. v. Chicago Title Ins. Co.*, 2012 WL 1986587, at *2 (N.D. Ill. June 2, 2012) (holding that, "to be cognizable under [a] cooperation clause" requiring the insured to "give the [insurer] all reasonable aid in … prosecuting or defending the action or proceeding," "any prejudice must involve the [underlying] litigation"); *Hartford Fire Ins. Co. v. Guide Corp.*, 2005 WL 675406, at *7 (S.D. Ind. Feb. 14, 2005) (noting that it is more difficult for an insurer to show prejudice when the insured is subject to "narrower policy obligations to provide information").

Citing *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 579 N.E.2d 322 (Ill. 1991), Homeland argues that "Illinois law allows an insurer to establish substantial prejudice by showing that the insured's noncooperation prevented the insurer from gathering relevant information necessary to its coverage investigation." Doc. 248 at 7. Homeland's reliance on *Waste Management* is misplaced. *Waste Management* does not discuss prejudice or the point at which an insured's breach of the duty to cooperate relieves the insurer of its coverage obligations; rather, the decision addresses the insured's cooperation obligations in the context of a discovery dispute in a coverage case. *See Waste Mgmt.*, 579 N.E.2d at 324-25.

True enough, *Waste Management* states in dicta that a cooperation clause requiring the insured to assist in the insurer's defense of claims imposes a concomitant obligation on the insured to "aid the insurer in its determination of coverage under the policy." *Id*. at 333. But the insured's duty to assist in the insurer's coverage determination arises from the fact that "[i]t is a necessary prerequisite to recovery upon a policy for the insured to show a claim within the coverage provided by the policy." *Ibid*. It follows that the insured's duty to assist in the insurer's coverage determination does not arise unless and until the insured requests coverage from the insurer, as the insured in *Waste Management* had done. *See id*. at 325. Because HCSC has not yet asked Homeland for a coverage determination for the MDL Action, Doc. 262 at ¶¶ 5-7, any duties imposed on HCSC by *Waste Management* to cooperate in Homeland's coverage investigation have not yet been triggered.

Moreover, even if prejudice to Homeland's ability to "formulate a coverage determination" *were* sufficient to relieve Homeland of its coverage obligations, Doc. 248 at 17, Homeland has not suffered any such prejudice, because, as noted, HCSC has not yet asked Homeland to determine whether there is coverage for the Subscriber Settlement under the

Homeland policy. Doc. 262 at ¶ 7. Indeed, HCSC has not asked Homeland for any payment related to the MDL Action, including funding for the Subscriber Settlement or its defense expenses. *Id.* at ¶¶ 5-6; Doc. 283 at ¶ 17. Homeland submits that HCSC's requests that Homeland waive its "lack of consent" defense prejudiced it because "Homeland can no longer deny coverage based on lack of consent to the settlement." Doc. 248 at 17. But Homeland in fact did not give up anything by waiving its "lack of consent" defense, because the waiver was subject to Homeland retaining all its rights and coverage defenses, including the right to challenge the reasonableness of the settlement. Doc. 262 at ¶ 3. As Newman (Homeland's expert) explained, a "lack of consent" waiver "preserve[s] the insurer's rights … with respect to challenging the reasonableness of the settlement or [] raising other coverage issues but still allow[s] the policyholder to settle without violating the consent to settle clause," thus "allowing the insurer to raise any coverage defenses or arguments about the unreasonableness of the settlement after you get rid of the Plaintiffs." *Id.* at ¶ 8. Newman explained further that the "lack of consent" waiver advantages the insurer, as it allows the insured to settle the case—eliminating the risk of a bad faith claim against the insurer—without forcing the insurer to "waive any other coverage defense or its right to challenge the reasonableness of the settlement." *Id.* at ¶ 9. Two other Homeland witnesses, Unger and Troy, agreed that it is in Homeland's interest to waive its "lack of consent" defense in order to allow an insured to reach a settlement before Homeland is ready to make a coverage determination. Doc. 251 at ¶¶ 10-12. Thus, as this court ruled earlier in the litigation, because Homeland "waive[d] its lack of consent defense while maintaining all other defenses … Homeland's asserted harms are illusory." Doc. 78 at 2.

Accordingly, HCSC is entitled to summary judgment on Homeland's claim that HCSC's alleged lack of cooperation relieves Homeland of its coverage obligations.  It necessarily follows that Homeland's motion for summary judgment on that claim is denied.

## III.   Exhaustion Provision

Finally, Homeland claims that HCSC cannot satisfy the Homeland policy's Exhaustion provision. Doc. 59 at ¶¶ 97-99; Doc. 168-1 at 15-18.  Specifically, Homeland contends that HCSC's "refus[al] to provide … the terms of its settlement [in the *Allied World* suit] with underlying insurers Allied World and Travelers" bars coverage because HCSC "cannot now prove exhaustion of the underlying policies."  Doc. 168-1 at 4.  According to Homeland, coverage is triggered only when the underlying policies are exhausted by payment made by the underlying insurer, without any contribution from HCSC, which HCSC cannot prove without disclosing the *Allied World* settlement's terms—specifically, HCSC's possible agreements with Travelers and Allied World, respectively, regarding how much coverage each must provide for HCSC's expenses in the MDL Action.  *Id*. at 15-16.  HCSC responds that it can prove exhaustion of the underlying policies without disclosing the settlement agreement, as Homeland's policy "recognizes exhaustion of the Underlying Insurance by payment of the limits of liability by either the Underlying Insurers or by HCSC itself."  Doc. 182 at 11; *see also id*. at 6 (arguing that, "under the Homeland Policy, the Underlying Insurance may be exhausted by payment of Loss made by the Underlying Insurers or by HCSC itself").  In addition to opposing Homeland's summary judgment motion seeking a declaration that its coverage obligations cannot be triggered due to HCSC's failure to disclose the settlement agreement, HCSC seeks summary judgment on the narrower question whether the Homeland policy allows the underlying insurance to be exhausted by payments made by either "the Underlying Insurers or by HCSC itself (or another party on its behalf)."  *Id*. at 6.

The Exhaustion provision states that Homeland's coverage obligation is not triggered until the Allied World and Travelers policies "ha[ve] been exhausted by actual payment thereunder." Doc. 286 at ¶ 2; Doc. 191-2 at 12, § I.A. The Homeland policy adds that Homeland "will not have any obligation to make any payment [] unless and until the full amount of the applicable limit of liability of the Underlying Insurance [the Allied World and Travelers policies] has been paid by the issuer(s) of the Underlying Insurance, *the Insured or by another party on behalf, or for the benefit, of the Insured* or the issuer(s) of the Underlying Insurance." Doc. 262 at ¶ 58; Doc. 191-2 at 13, § I.E (emphasis added). By its plain terms, the Exhaustion provision allows exhaustion of the Allied World and Travelers policies via payment by the underlying insurers—Allied World and Travelers—*or* by the insured, HCSC.

Resisting that result, Homeland contends that, in light of the *Travelers* policy's exhaustion provision, the Allied World policy can be exhausted for purposes of the *Homeland* policy only by payment by Allied World itself. Doc. 168-1 at 15-16. (Recall that the Allied World policy is the primary policy; Travelers is the first-layer excess policy; and Homeland is the second-layer excess policy.) That argument fails for two independent reasons.

First, the Travelers policy in fact allows payments by HCSC to count toward exhaustion of the Allied World policy. Section 3(A) of that policy states: "The Insurer shall only be liable to make payment under this policy after the total amount of all Underlying Limits of Liability has been paid in legal currency by the issuers of all Underlying Insurance as covered loss thereunder." Doc. 243 at ¶ 58; Doc. 59-1 at 905, § 3.A. Section 3(A), standing alone, requires Allied World to pay the "total amount" of coverage in order to satisfy the Travelers policy's exhaustion requirement. Section 3(A), however, does not stand alone. Section 3(E), as amended by an endorsement, states:

> Notwithstanding any of the terms of this policy which might be construed
> otherwise, the policy shall drop down only in the event of reduction or
> exhaustion of the Underlying Insurance as described above, and shall not drop
> down for any reason including, but not limited to, uncollectability, in whole or
> in part, of any Underlying Insurance; *provided that an Insured may pay a
> portion of loss that would otherwise be payable as covered loss by an issuer of
> any Underlying Insurance*.

Doc. 262 at ¶ 59; Doc. 59-1 at 911 (emphasis added).

Thus, Section 3(E) allows for exhaustion even when the insured "pay[s] a portion" toward the underlying policy's coverage limit. And because Section 3(E) expressly states that it applies "[n]otwithstanding any of the terms of this policy which might be construed otherwise," its terms—which allow payments by HCSC to satisfy exhaustion—control. *See United States v. France*, 782 F.3d 820, 825 (7th Cir. 2015) ("[T]he use of [] a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section.") (quoting *Cisneros v. Alpine Ridge Grp*., 508 U.S. 10, 18 (1993)), *judgment vacated on other grounds*, 577 U.S. 1026 (2015); *United States v. All Funds on Deposit with R.J. O'Brien & Assocs*., 783 F.3d 607, 620 (7th Cir. 2015) (recognizing the "potent power of a 'notwithstanding' clause" to "supercede conflicting provisions").

Second, even if the Travelers policy required exhaustion of the Allied World policy by Allied World's payments alone, that requirement would not be incorporated into the Homeland policy. As noted, the Homeland policy incorporates the Travelers policy's terms only to the extent that they are not "to the contrary [of those] contained in [the Homeland] Policy." Doc. 283 at ¶ 14; Doc. 191-2 at 12-13, § I.D.2. And the Homeland policy allows exhaustion by "the issuer(s) of the Underlying Insurance, the Insured or by another party on behalf, or for the benefit, of the Insured or the issuer(s) of the Underlying Insurance." Doc. 262 at ¶ 58; Doc. 191-2 at 13, § I.E. Accordingly, if the Travelers policy required exhaustion of an

underlying policy by the underlying insurer's payment alone, that term would conflict with the Homeland policy's exhaustion provision and thus would not be incorporated into the Homeland policy.

Because the Homeland policy does not provide that "*only Allied World* can pay" toward exhausting the Allied World policy, Doc. 282 at 9, Homeland is wrong to argue that HCSC "cannot carry its burden of establishing that the underlying limits were properly exhausted" without producing the *Allied World* settlement agreement "disclos[ing] who paid what amount." Doc. 168-1 at 15-16. Rather, the Homeland policy unambiguously allows HCSC to contribute toward exhaustion of the underlying policies, resulting in the award of summary judgment to HCSC on that narrow issue.

Homeland's other arguments as to why HCSC's failure to produce the *Allied World* settlement agreement precludes HCSC's ability to prove exhaustion under Homeland's policy lack merit. First, Homeland submits that the settlement agreement *might* modify the underlying policies by "permitting HCSC to contribute toward Allied World's policy limits." Doc. 168-1 at 17; *see* Doc. 243 at ¶ 59; Doc. 191-2 at 14, § III.C ("No amendment or modification to any Underlying Insurance shall be binding upon the Underwriter … without the express written agreement of the Underwriter."). Homeland reasons that, because HCSC cannot modify the underlying policies without Homeland's written consent—which Homeland did not provide, Doc. 270 at ¶ 13—any modifications to the Travelers policy's exhaustion requirements "are not binding on Homeland," meaning that HCSC would not have properly exhausted the underlying insurance under Homeland's policy. Doc. 168-1 at 17. And because the settlement agreement is "[t]he only document detailing whether the Underlying Policies were modified," Homeland adds,

HCSC's failure to produce the agreement precludes Homeland from determining whether the underlying policies were properly exhausted. *Ibid*.

That argument fails. To begin with, as explained above, the Travelers policy allows HCSC to contribute toward exhaustion of the Allied World policy limits. There is thus no reason to believe that the settlement agreement modified the Travelers policy's exhaustion requirements. Moreover, also as explained above, the exhaustion provisions in the *Homeland* policy—not in the Travelers policy—govern whether the underlying insurance has been properly exhausted. Because the Homeland policy's exhaustion provision unambiguously allows "the Insured [HCSC]" to pay toward exhaustion of "the full amount of the applicable limit of liability of the Underlying Insurance," Doc. 262 at ¶ 58; Doc. 191-2 at 13, § I.E, any modification of the Travelers policy to allow HCSC to pay toward exhaustion would not change the Homeland policy's exhaustion requirement. Accordingly, any potential modification effected by the *Allied World* settlement agreement to the Travelers policy's exhaustion requirements is immaterial to Homeland's exhaustion analysis.

Next, based on the premise that "its coverage cannot be broader than the Underlying Policies," Homeland argues that "[i]f HCSC's settlement [agreement] attempts to exhaust Allied World's limits through contribution by HCSC, that would render Homeland's coverage broader than the Underlying Policies as written because the Travelers Policy provides that the Allied World Policy can only be exhausted through payment by Allied World." Doc. 168-1 at 17. Homeland's premise is incorrect, as the Travelers policy's plain terms allow HCSC to contribute toward exhaustion of the Allied World policy. In addition, the Homeland policy provision cited by Homeland, Section I(D)(4), states that "the coverage provided by [Homeland's] Policy shall not be broader than any Underlying Insurance *unless expressly provided herein*." Doc. 243 at

¶ 60; Doc. 191-2 at 13, § I.D.4 (emphasis added). So, even if the Travelers policy prohibited HCSC from contributing toward exhaustion of the Allied World policy, the Homeland policy "expressly provide[s]" that HCSC *may* so contribute. Doc. 262 at ¶ 58; Doc. 191-2 at 13, § I.E. It follows that any modification to the Travelers policy's exhaustion requirement effected by the settlement agreement would not have impermissibly made Homeland's coverage broader than that of the underlying policies.

Finally, Homeland contends that, "[w]ithout [HCSC] producing the [*Allied World*] settlement agreement or its terms, Homeland can never know" whether "the Underlying Policies [were] exhausted by payments for *covered* entities." Doc. 168-1 at 17-18. The Homeland policy states that "the applicable limit of liability of the Underlying Insurance shall be deemed to be reduced or exhausted solely as a result of payments for loss or damages … that are covered under this Policy." Doc. 243 at ¶ 61; Doc. 191-2 at 12-13, § I.D.3. Homeland argues that, if Allied World and Travelers paid under the *Allied World* settlement for defense expenses associated with "non-covered entities, such as the Association or BCBS-MT (an entity later acquired by HCSC)," those payments would be for losses not covered by the Homeland policy and therefore would not apply toward exhaustion of the underlying policies. Doc. 168-1 at 18.

This argument ventures too far into the realm of speculation to support summary judgment for Homeland. *See Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 695 (7th Cir. 2011) ("[The defendant's] unbolstered assumption is speculative and insufficient to support summary judgment."); *see also Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) ("Where … the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must … demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim. If the movant has failed to make this initial

showing, the court is obligated to deny the motion.") (internal citations omitted) (collecting cases). Homeland cites no evidence concerning HCSC's relationship (if any) to BCBS-MT or suggesting that HCSC would be liable for the Association's expenses or liability in the MDL Action, and therefore why the *Allied World* settlement would provide for payments benefitting the Association or BCBS-MT. Nor does Homeland support its assertion that the *only* way HCSC can prove that the underlying policies were exhausted by payments for covered losses is by "producing the settlement agreement or its terms." Doc. 168-1 at 18. Simply put, Homeland's argument rests on a chain of assumptions, none of which are supported by the record. And even if the question on summary judgment were closer, the court would exercise its discretion under 28 U.S.C. § 2201 to decline to enter Homeland's requested declaration because, at this juncture, HCSC has not even requested coverage in the MDL Action. *See Wilton*, 515 U.S. at 288 (holding that "a district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment" in light of "considerations of practicality and wise judicial administration"); *Booker v. Assocs. Agencies, Inc.*, 1993 WL 157506, at *4 (N.D. Ill. May 11, 1993) (noting that the "general rule against considering indemnity issues prior to a judgment in the [underlying] case," announced by the Seventh Circuit in *Travelers Insurance Cos. v. Penda Corp.*, 974 F.2d 823, 833-34 (7th Cir. 1992), counsels "against exercising jurisdiction over a declaratory action"); *see also* 174 A.L.R. 880 ("[C]ourts will not determine future rights in anticipation of an event that may never happen … .") (internal quotation marks omitted) (2022).

Accordingly, Homeland is not entitled on summary judgment to a declaration that "HCSC cannot prove exhaustion as a result of its failure to provide the settlement agreement with Allied World and Travelers … and thus, cannot trigger coverage under Homeland's

Policy." *Ibid*. And as noted, HCSC is entitled to summary judgment on the narrower question whether Homeland's policy allows HCSC to contribute toward exhaustion of the underlying policies. The question whether HCSC can show that the Allied World and Travelers policies were or will be exhausted by payments for losses sustained by entities covered under the Homeland policy, without disclosing the *Allied World* settlement, remains undecided.

### Conclusion

Homeland's summary judgment motion as to the Related Claims provision is granted as to the Provider Track of the MDL Action and denied as to the Subscriber Track. HCSC's summary judgment motion as to the Related Claims provision and Prior and Pending exclusion is granted as to the Subscriber Track and denied as to the Provider Track. Homeland's summary judgment motion as to the Cooperation and Exhaustion provisions is denied, and HCSC's summary judgment motions as to those provisions are granted. The court declares that the Homeland policy's Related Claims provision precludes HCSC from obtaining coverage from Homeland for the Provider Track of the MDL Action.

July 19, 2022

_____

United States District Judge